KELLY, Circuit Judge.
John Hugh Gilmore appeals the district court’s[1] adverse grant of summary judgment on his claims alleging violations of his First, Fourth, and Fourteenth Amendment rights, unlawful arrest under Minnesota law, and an unconstitutional policy under Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We agree with the district court that the officers are entitled to qualified immunity for Gilmore’s federal law claims, official immunity for Gilmore’s state law claim, and that Gilmore has not made out a claim under Monell. We therefore affirm the judgment of the district court.
I. Background
• Around 10 p.m. on June 16, 2011, police received a 911 call from Matthew Glazer, reporting a disturbance and a suspicious white male with gray hair, wearing sandals and all-black clothing, on Nicollet Mall. Glazer stated that the person described was yelling at people on the street, shouting racial slurs, and taking photos of the people he was targeting. When officers arrived on the scene in response to the 911 call, Glazer flagged them down. Glazer reported to the officers that a man, who was later identified as John Hugh Gilmore, had asked two women wearing hijabs their opinion of Ayaan Hirsi AÍi,[2] and then began screaming racial slurs at them. Glazer also claimed that Gilmore had tried to assault him, and stated he thought Gilmore would try to hurt him again. Whether or not Gilmore actually engaged in the conduct described, he does not dispute that this is what Glazer told the officers when they arrived at the scene.
The officers proceeded to The News Room restaurant, where Glazer said Gilmore had gone. According to Gilmore, approximately five minutes after he arrived at the restaurant, Officers Deitan Dubuc and Joshua Stewart entered and asked to speak to him. When he refused, they escorted Gilmore out of the restaurant, using a wrist lock to force him to leave.[3] Gilmore had drunk 3-4 glasses of wine that night, but he says he was not intoxicated.
After they left the restaurant with Gilmore, Officers Dubuc and Stewart sought to gather more information. According to the officers, Gilmore refused to speak with them about what had happened. Gilmore, on the other hand, alleges that he was not given an opportunity to tell the officers his side of the story, but that he was coopera *831 tive with them. Based on the information the officers had regarding the events of the evening and the fact that, from their perspective, Gilmore was “mad” and “refused to cooperate,” they handcuffed him and placed him in the back of them squad car.
The officers then interviewed several witnesses. Gilmore’s friend, Paul Carlson, said he could not hear what was being said between Gilmore and the group of people he was allegedly yelling at, because he was across the street, but that Gilmore was 8-10 feet away from the group and his hands were in his pockets. The two women wearing hijabs reported that after they told Gilmore they did not think favorably of Ayaan Hirsi Ali but they “would agree to disagree,” Gilmore yelled, <fWhy did you come to my country and try to change us? You’re in the [W]est here.” They relayed that Gilmore also made other comments that made them “fearful” and “terrified.” When Gilmore started taking photos of the women, Glazer inserted himself between the women and Gilmore. Another witness, Elisabeth Geschiere, confirmed the two women’s story. The officers also spoke again to Glazer, who then filled out a citizen’s arrest form on which he indicated that, during the confrontation, he asked Gilmore whether he knew the difference between assault and battery. Gilmore’s alleged reply was, “I haven’t hit anyone ... yet. Just wait.” Geschiere also expressed fear that Gilmore would hurt someone at the scene. Gilmore disputes the truth of the witnesses’ statements, but does not dispute that this was the information given to the officers while he sat in the back of the police car.
Gilmore recounted a different version- of events. He asserted that after attending a political gathering, he passed several women' wearing hijabs near 11th Street and Nicollet Avenue, and asked them their opinion of Ayaan- Hirsi Ali. Gilmore claimed that a “flash mob” of people from a progressive political conference suddenly appeared, surrounded him, and began aggressively yelling.- Gilmore said that he pretended to make a phone call to a friend and to videotape the activists with his phone. He said he feared for his safety and was chased down Nicollet Mall before entering The News Room.
Gilmore also alleged that the officers first said they would release him if he agreed to leave the downtown area, and then changed their minds and decided to take Gilmore to jail. Before leaving the scene outside The News Room and while sitting in the police vehicle, Gilmore saw an officer rip up and throw away a political sign bearing the name of Gilmore’s website that Gilmore had with him at the restaurant. Gilmore said he complained about the sign to the two officers in the front of the transport vehicle. The officers have stated they have no memory of the sign being destroyed, and further that prisoners in the back of á police transport vehicle have no way to communicate with officers sitting in the cab.
At the police station, Gilmore was charged with disorderly conduct and interference with lawful process, both misdemeanors. Officer Dubuc noted in his supplemental report that Gilmore was booked in part because he was intoxicated, which Gilmore denies, and because Dubuc feared that Gilmore would not comply with an order to leave the area and would instead return to the crowd and continue engaging in the allegedly disorderly conduct. Once at the Hennepin County Jail, Gilmore was processed for release. The charges against Gilmore were subsequently dropped.
II. Discussion
Gilmore contends the district court erred in granting summary judgment on *832 his various claims. Viewing the facts in the light most favorable to the non-moving party, we review the district court’s grants of summary judgment de novo. Carpenter v. Gage, 686 F.3d 644, 648 (8th Cir. 2012); Fed. R. Civ. P. 66(a).
A. Fourth Amendment, False Arrest Claim
“Qualified immunity shields government officials from liability and the burdens of litigation in a § 1983 action unless the official’s conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.” Snider v. City of Cape Girardeau, 752 F.3d 1149, 1155 (8th Cir. 2014) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). “To overcome a defendant’s claim of qualified immunity, the burden falls on [Gilmore] to show: ‘(1) the facts, viewed in the light most favorable to [Gilmore], demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation.’ ” Id. (quoting Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir. 2010)).
Gilmore alleges first that his arrest was not supported by probable cause. “A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least ‘arguable probable cause.’ ” Borgman v. Kedley, 646 F.3d 518, 522-23 (8th Cir. 2011) (quoting Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005)). A law enforcement officer has probable cause “when the totality of the circumstances at the time of the arrest ‘are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.’ ” Id. at 523 (quoting Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816 (8th Cir. 2010)). If an officer arrests a suspect, under -the mistaken belief that there is probable cause, arguable probable cause exists “if the mistake is ‘objectively reasonable.’ ” Id, (quoting Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008)).
Gilmore was arrested for disorderly conduct and obstructing legal process. Both are misdemeanors under Minnesota law. See Minneapolis, Minn., Code of Ordinances , Title 15 . § 385.90; Minn. Stat. § 609.72 subd. 1(3); Minn. Stat. § 609.50, subd. 1(1). Under Minneapolis’s local ordinance, a person may be arrested for disorderly conduct when he “engage[s] in, or prepare[s], attempt[s], offer[s] or threaten[s] to engage in, or assist[s] or conspire[s] with another to engage in, or congregated] because of, any riot, fight, brawl, tumultuous conduct, act of violence, or any other conduct which disturbs the peace and quiet of another.” Minneapolis, Minn., Code of Ordinances Title 15 § 385.90. Gilmore’s inmate booking sheet indicates he was arrested under the Minneapolis ordinance, but the state law governing disorderly conduct is slightly different. Under Minnesota law, a person is prohibited from engaging in “offensive, obscene, . abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others,” when the person knows that such conduct or language “will tend to[ ] alarm, anger or disturb others or provoke an assault or breach of the peace.” Minn. Stat. § 609.72 subd. 1(3).
When deciding whether to arrest a subject, “[o]fficers may ‘rely on the veracity of information supplied by the victim of a crime.’ ” Borgman, 646 F.3d at 523 (quoting Fisher, 619 F.3d at 817); see also Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (“[A]n officer may make an arrest if a credible eyewitness claims to have seen *833 the suspect commit the crime_”). “In considering information, given by a victim of a crime, an officer need not conduct a ‘mini-trial’ before effectuating an arrest although he-cannot avoid ‘minimal further investigation’ if it would have exonerated the suspect.” Borgman, 646 F.3d at 523 (quoting Kuehl, 173 F.3d at 650). “An officer contemplating an arrest is not free to disregard plainly exculpatory evidence ....” Kuehl, 173 F.3d at 650.
Glazer’s 911 call and in-person account to the officers would provide probable cause for an arrest for disorderly conduct. Though Gilmore is correct that there were conflicting versions of events that occurred on the night of June 16, 2011, that fact, on its own, does not establish there was plainly exculpatory evidence available to the officers at or near the time of Gilmore’s arrest'. “When an officer is faced with conflicting information that cannot be immediately resolved ... he may have arguable probable cause to arrest a suspect.” Borgman, 646 F.3d at 523 (citing Amrine, 522 F.3d at 832-33). There was no plainly exculpatory evidence — such as evidence that Gilmore did not fit the description the 911 caller had given, or that Glazer was clearly not a credible witness — that the officers here ignored. The report of Gilmore’s attempting to' assault Glazer, and yelling-at, taking pictures of, and threatening various other people would give officers at least arguable probable cause for his arrest. See, e.g., In re Welfare of T.L.S., 713 N.W.2d 877, 880-81 (Minn. Ct. App. 2006); State v. McCarthy, 659 N.W.2d 808, 811 (Minn. Ct. App. 2003).[4] Based on the record before us, there was nothing the officers could have immediately discovered that would have exonerated Gilmore by conclusively contradicting Glazer’s statement.
Gilmore argues that there was insufficient evidence to charge him with any offense, in part because he was processed for immediate release and videos portraying the incident came to light after the fact and supported his version of events.[5] But “probable cause is determined ‘at the moment the arrest was made,’ [and] any later developed facts are irrelevant to the probable cause analysis for an arrest.” Amrine, 522 F.3d at 832 (quoting United States v. *834 Rivera, 370 F.3d 730, 733 (8th Cir. 2004)). The evidence Gilmore points to, such as the videos and his processing for immediate release at the police station, was developed after the arrest and is therefore not relevant to the question of arguable probable cause. The city’s attempt to put forth later-developed witness statements likewise does not affect the probable cause analysis, and is relevant only to determine whether “minimal further investigation” would have exonerated Gilmore. When the officers detained Gilmore based on the 911 call and Glazer’s statement, they had arguable probable cause to arrest Gilmore.[6]
Compheating the situation is the fact that Minnesota law requires an arresting officer to witness a misdemeanor in order to arrest a suspect for it, and Gilmore argues this is independent grounds for concluding his arrest was in violation of the Fourth Amendment. Minn. Stat. § 629.34(c). The city contends that Glazer’s citizen’s arrest satisfied the “in-presence” requirement. We need not decide whether the citizen’s arrest satisfied the “in-presence” requirement in order to resolve Gilmore’s Fourth Amendment claim, however, as this circuit has not decided “whether the Fourth Amendment permits, a warrantless arrest for a misdemeanor when the alleged offense did not occur in the presence of the arresting officer.” Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1258 (8th Cir. 2010). “A constitutional or statutory right is clearly established if ‘[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.’” Snider, 752 F.3d at 1155 (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Because the law regarding warrantless misdemeanor arrests for offenses committed outside the presence of the arresting officer is not clearly established under the Fourth Amendment, the arresting officers are entitled to qualified immunity on Gilmore’s constitutional claim. See, e.g., Farkarlun v. Hanning, 855 F.Supp.2d 906, 923 (D. Minn. 2012).[7]
B. State Law False Arrest Claim
Gilmore also asserts that his arrest was unlawful under Minnesota state law. The district court determined that the officers were entitled to official immunity on this claim. Under Minnesota law, official immunity “protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong.” Rico v. State, 472 N.W.2d 100, 106-07 (Minn. 1991). “[T]he conduct of police officers in responding to a dispatch or making an *835 arrest involves precisely the type of discretionary decisions, often split-second and on meager information, that we intended to protect from judicial second-guessing through the doctrine of official immunity.” Kelly v. City of Minneapolis, 598 N.W.2d 657, 665 (Minn. 1999) (citing Elwood v. Rice Cty., 423 N.W.2d 671, 678-79 (Minn. 1988)). However, an officer may be guilty of a “wilful or malicious wrong,” and excepted from the protections of immunity, when he or she knows or has reason to know he or she is doing something illegal:
The defendant must have reason to know that the challenged conduct is prohibited. The exception does not impose liability merely because an official intentionally commits an act that a court or a jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.
Rico, 472 N.W.2d at 107. In order to overcome the officers’ claim of official immunity, therefore, Gilmore must show the officers had reason to know that arresting him was prohibited. A person is falsely arrested under Minnesota law “if an arrest is made without proper legal authority.” Baribeau, 596 F.3d at 481 (quoting Lundeen v. Renteria, 302 Minn. 142, 224 N.W.2d 132, 135 (1974)). Gilmore asserts that, unlike our Fourth Amendment law, there is a clear “in-presence” requirement for misdemeanor arrests in Minnesota. The “in-presence” requirement means that a misdemeanor arrest “conforms to Minnesota law as long as police officers have observed conduct giving rise to probable cause to believe that the offense was committed.” Id. at 481-82. The officers here are not entitled to official immunity if they had reason to know that the “in-presence” requirement was not satisfied by a citizen’s arrest. Minnesota’s state law precedent, however, does not provide any such reason.
Minnesota Statutes § 629.37(1) allows a private person to make an arrest for a crime “committed or attempted in the arresting person’s presence.” See also Lake Minnetonka Cons. Dist. v. Horner, 617 N.W.2d 789, 794 (Minn. 2000) (noting application as to misdemeanors). The private person must “inform the person to be arrested of the cause of the arrest and require the person to submit.” Minn. Stat. § 629.38. Since Officers Dubuc and Stewart did not personally witness Gilmore’s disorderly conduct and therefore could not satisfy the “in-presence” requirement themselves, the city relies on Glazer’s citizen’s arrest. Gilmore alleges that the citizen’s arrest was invalid because Glazer did not fill out the citizen’s arrest form until after Gilmore was handcuffed and therefore arguably already arrested, and because he did not inform Gilmore of the cause of his arrest, as the citizen’s arrest statute requires. See Minn. Stat. § 629.38.
A citizen’s arrest may be valid, even if it is an officer who takes custody of the suspect. In State v. Duren, officers asked a private citizen who had witnessed an alleged misdemeanor to sign a citizen’s arrest form, because the officers had not witnessed the commission of the offense themselves. 266 Minn. 335, 123 N.W.2d 624, 631 (1963). The court noted “[i]t is clear from the record that after defendant’s arrest by [the citizen] she in effect delivered him to the police officers present who already had him in custody,” and concluded that the fact that “such arrest was made by [the citizen] at the request of the police officers who had arrived after the accident would not affect its validity if § 629.37 were followed.” Id.; see also United States v. Rambo, 789 F.2d 1289, 1293 n.5 (8th Cir. 1986) (noting that under Minnesota law “[p]olice officers are au *836 thorized to take custody of an individual arrested by a private person, which means in practice that police officers often are the ones , who actually effect the arrest, acting on behalf of the citizen-complainant” (citations omitted)). The district court concluded that Glazer had witnessed all of Gilmore’s relevant behavior, and could effect a citizen’s arrest by asking the officers to detain Gilmore after the fact. See Duren, 123 N,W.2d at 631. Gilmore also argues that Glazer did not comply with the statutory requirement of “informing] the person to be arrested of the reasons therefor,” but Glazer did not need to complete that requirement personally. Under Minnesota law, the officer could do that on his behalf. See id. (“[The police officers] already had [the defendant] in custody and ... acting on [the private citizen’s] behalf, advised [the defendant] of the reasons upon which [the private citizen] had based his arrest, indicative of compliance with the statutory requirements outlined.”).
Gilmore points to the case of State v. Jensen, arguing that “[t]he purpose of the presence requirement is to prevent war-rantless misdemeanor arrests based on information from third parties.” State v. Jensen, 351 N.W.2d 29, 32 (Minn. Ct. App. 1984). “Whén the basis of the officer’s belief that the defendant has committed a misdemeanor is information imparted to him by, say, victims, witnesses or informers ... [h]e may not act on his own appraisal of the reasonableness of the information.” Id. (quoting People v. Dixon, 392 Mich. 691, 222 N.W.2d 749, 751 (1974)). The problem in that case, however, was the same one that invalidated the arrest in Duren — namely, that no one person witnessed all of the elements of the crime. Here, Glazer witnessed everything necessary to arrest Gilmore for disorderly conduct. While the Minnesota case law on the precise contours of, a valid citizen’s arrest is limited, what law does exist gave the officers no “reason to believe” that the arrest in this case was prohibited. Rico, 472 N.W.2d at 107.
Whether the officers’ continued detention of Gilmore pursuant to Minnesota Rule of Criminal Procedure 6.01 was valid is, as the district court noted, “an even more difficult question.” Rule 6.01 requires that an arresting officer in misdemeanor cases, proceeding without a warrant, “must issue a citation and release the defendant unless it reasonably appears: (1) the person must be detained to prevent bodily injury to that person or another; (2) further criminal conduct will occur; or (3) a substantial likelihood exists that the person will not respond to a citation.” Minn. R. Crim. P. 6.01. “If the officer has already arrested the person, a citation must issue and the person must be released,” unless any of the exceptions are present. Id The officers here stated that Gilmore initially refused to give his name and that they believed he was likely to commit further criminal conduct due to intoxication. Glazer stated that Gilmore had attempted to assault him, and that he was afraid Gilmore might try to hurt him again, Geschi-ere told one of the officers that she had been afraid that Gilmore would hurt Someone at the scene. Gilmore, however, states that he was cooperative, that he was not intoxicated, and that he was not given the opportunity to provide any information on his own behalf. See Minneapolis Police Dep’t. v. Kelly, 776 N.W.2d 760, 768-69 (Minn. Ct. App. 2010) (noting “the defendant’s attachment to the community and prior history of response to the criminal process are relevant guideposts for ... a determination” as to whether a defendant will respond to a citation, and arresting officers should investigate and consider such information).
While we conclude that there remain disputed issues of fact regarding whether *837 the officers had reason to know Rule 6.01 made their actions unlawful, another statute, Minnesota Statutes section 629.36, also applies to the facts of this case. In contrast to the officers’ obligations under Rule 6.01, section 629.36 provides: “When a bystander arrests a person for breach of the peace, the bystander may deliver that person to a peace officer. The peace officer shall take the arrested person to a judge for criminal processing.” .While this statute leaves us with more questions than it resolves, and precedent from the Minnesota courts analyzing the statute is lacking, it does seem in direct conflict with Rule 6.01, creating confusion as to the officers’ statutory obligations under the circumstances. See Gleason v. Metro. Council Transit Operations, 563 N.W.2d 309, 318 (Minn. Ct. App. 1997) (noting official immunity applies when the official demonstrates “that the right allegedly violated was not clearly established, that is, that there was no basis for knowing the conduct would violate the plaintiffs rights”). Rule 6.01 requires release on citation unless certain circumstances exist; section 629.36 seems to require a person be taken .into immediate custody, at least for a brief period, by the peace officer. Whether a “bystander” is a citizen for purposes of a citizen’s arrest and what is meant by “criminal processing” are not clear from the statute, but that very lack of clarity is.what prevents us from concluding that the officers knew or had reason to know that their conduct in continuing to detain Gilmore was prohibited. We have no conclusive reason to believe that Rule 6.01 does not apply to citizen’s arrests for misdemeanors, and Gilmore’s continued detention may not have been “‘objectively’ legally reasonable,” see Gleason, 563 N.W.2d at 318, but we cannot conclude that Gilmore’s arrest was “clearly established” as unlawful given the existence of section 629.36.[8]
The combination of this statute and Rule 6.01 creates potentially odd results: identical misdemeanor conduct could leave an individual either with a citation (or else a false arrest claim) or being taken immediately to a judge for “criminal processing,” depending solely on who witnesses the crime and effects the arrest. Yet we must leave that troubling thought to the Minnesota legislature to resolve. Since we do not believe the officers had sufficiently clear knowledge of what was required of them under the, circumstances, neither can we conclude that they acted maliciously or wilfully in violating Gilmore’s rights. See Rico, 472 N.W.2d at 109; see also Gleason, 563 N.W.2d at 318. As a result, the officers are entitled, to official immunity on Gilmore’s state law false arrest claim.
C. First Amendment Claim
Gilmore argues that the district court erred in finding that the officers did not violate his First Amendment right to freely express himself when they destroyed his political sign. Unlike Snider, 752 F.3d 1149, on which Gilmore relies, this case does not involve the application of an unconstitutional ordinance. Gilmore was not arrested for displaying his sign or for any message he conveyed by having it. Instead, he was arrested for disorderly conduct, and the officers seized the sign in the course of that arrest. Destruction of the sign may implicate other of Gilmore’s rights, but he provides no authority for the proposition that the seizure of a political or viewpoint-based sign incident to a lawful arrest is a per se First Amendment violation. Moreover, he points to nothing' that *838 would give officers notice that any such right was clearly established at the time. Id. at 1155 (stating that whether a right was clearly established at the time of arrest turns on whether “in the light of preexisting law the unlawfulness [of the officers’ conduct was] apparent” (quoting Creighton, 483 U.S. at 640, 107 S.Ct. 3084)). Because Gilmore has failed to show a violation of any clearly established First Amendment right, the officers are entitled to summary judgment on Gilmore’s First Amendment claim. See Smithson v. Aldrich, 235 F.3d 1058, 1063 (8th Cir. 2000).
D. Property Seizure and Damage
Gilmore also argues that police improperly seized and destroyed his political sign in violation of his Fourth Amendment right to be free of unreasonable searches arid seizures. Because Gilmore’s arrest was not unconstitutional, the seizure of his sign was also valid. See Meehan v. Thompson, 763 F.3d 936, 946 (8th Cir. 2014) (“[A] search incident to [an] arrest requires no additional justification.” (second alteration in original) (quoting United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973))); United States v. Baldenegro-Valdez, 703 F.3d 1117, 1125-26 (8th Cir. 2013); Moreno v. Turner, 572 Fed.Appx. 852, 857 (11th Cir. 2014) (unpublished) (“Because the war-rantless arrest was supported by at least arguable probable cause, [the officer] was also entitled to search [the arrestee] incident to arrest.”). Moreover, if the seizure was valid, we doubt Gilmore can assert a Fourth Amendment claim over the sign’s destruction. See Ali v. Ramsdell, 423 F.3d 810, 814 (8th Cir. 2005) (“We have considerable doubt whether an allegation that property appropriately seized in executing a valid search warrant but not inventoried and stored in the manner required by state law even states a claim under the Fourth Amendment.”); Hudson v. Palmer, 468 U.S. 517, 538-39, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (O’Connor, J., concurring) (“[I]f the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government’s custody is not itself of Fourth Amendment concern. ... [A]ny losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation.”). Gilmore therefore has not presented a clearly established right preventing the destruction of his sign under the Fourth Amendment. Furthermore, while a Fourteenth Amendment due process claim for the destruction of property may be an alternative avenue for redress, Gilmore failed to raise such a claim, and we therefore decline to analyze one.
E. Monell Claim
“A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an ‘action pursuant to official municipal policy’ or misconduct so pervasive among non-policymaking employees of the municipality ‘as to constitute a “custom or usage” with the force of law.’ ” Ware v. Jackson Cty., Mo., 150 F.3d 873, 880 (8th Cir. 1998) (quoting Monell, 436 U.S. at 691, 98 S.Ct. 2018). Because Gilmore has failed to show any violation of his federal rights, this claim necessarily fails. See Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007).
III. Conclusion
We affirm the judgment of the district court.

. The Honorable John R. Tunheim, Chief Judge for the United States District Court for the District of Minnesota.

. Ayaan Hirsi Ali is an activist, author, and former politician who calls for a reformation of Islam and is a prominent supporter of women’s rights.

.While Gilmore asserts that he was cooperative with the officers, he does not state that he voluntarily agreed to leave the restaurant when asked.

. We recognize that it is a disputed fact whether Gilmore was given the opportunity to relay his version of events to the officers before being placed in handcuffs or in the squad car. Because we must construe the facts most favorably to Gilmore, we assume the officers failed to ask for his side of the story. But Gilmore does not argue that he would have said anything that would have negated the arguable probable cause stemming from Glazer’s call and in-person account. C£ Kuehl, 173 F.3d at 648 (holding officers lacked arguable probable cause because they spoke with the suspect for only twenty seconds, ignored exculpatory evidence, and failed to document a separate eyewitness account in the police report). The only evidence Gilmore presents as exculpatory here is the fact that his version of events would have conflicted with Glazer’s. That amounts only to "information that cannot be immediately resolved.” Borgman, 646 F.3d at 523.
Gilmore also notes that the magistrate judge concluded Gilmore had made out a "prima facie case for false arrest,” which allowed Gilmore to amend his complaint to include a claim for punitive damages. The judge, however, was not reviewing the record at summary judgment, and that preliminary order does not conflict with a finding of arguable probable cause here.

. While an officer may not arrest a suspect if he is "aware of ... a videotaped account of the crime that conclusively establishes] the suspect's innocence,” there is nothing in the record to establish that any video evidence portrayed the full events at issue, and there is no evidence that the officers here were contemporaneously aware of any videos. Kuehl, 173 F.3d at 650.

. Gilmore argues there was insufficient evidence to suggest he was intoxicated at the time of arrest. We agree the parties dispute this issue, but the officers arrested Gilmore for disorderly conduct, not public intoxication.

. Because Gilmore’s arrest for disorderly conduct was lawful under the Fourth Amendment, we need not consider whether the alternate basis of his arrest for obstruction of legal process was valid. Moreover, the district court did not base its rulings on the obstruction of legal process statute and the city failed to address the obstruction charge in its brief.
The district court also correctly rejected Gilmore's Fourteenth Amendment claim, as false arrest claims brought under the Fourteenth Amendment are analyzed identically to those brought under the Fourth Amendment. See Walker v. City of Pine Bluff, 414 F.3d 989, .992 (8th Cir. 2005); Graham v. Connor, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); McClennon v. Kipke, 821 F.Supp.2d 1101, 1104 n.4 (D. Minn. 2011) (noting that claims of unlawful arrest brought against state actors are analyzed under the Fourth Amendment standard). Gilmore does not contend otherwise.

. We note, however, that the officers in this case did not actually comply with the requirements of section 629.36, as Gilmore was never taken before a judge for “criminal processing."