# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1524
_____

Kiman Jay Kingsley

*Plaintiff - Appellant*

Kaleb Milferd Kingsley; Kingsley Brothers, LLC; Plane Cents Aviation, LLC

*Plaintiff*s

v.

Lawrence County, Missouri

*Defendant - Appellee*

Cynthia Kingsley; Lisa Kingsley; Kevin Kingsley; Misty Oczkus

*Defendant*s

Brad DeLay, Sheriff; Chris Berry, Deputy Sheriff; John Ford, Deputy Sheriff

*Defendants - Appellees*

Jackie Freeman; Greg DeJager; Stanley Kingsley; Jason Grubaugh; Douglas
Osborne; James P. Moroney

*Defendant*s
_____

Appeal from United States District Court
for the Western District of Missouri - Joplin

_____

Submitted: March 11, 2020
Filed: July 2, 2020

_____

Before GRUENDER, ARNOLD, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Kiman Kingsley appeals the district court's[1] adverse grant of summary judgment on his 42 U.S.C. § 1983 claims against Lawrence County, Missouri; Sheriff Brad DeLay; Deputy Sheriff Chris Berry; and Deputy Sheriff Jon Ford. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

In 1995, Kiman[2] and his siblings Kaleb, Kaland, and Karen purchased a farm (the Kingsley Farm) in Lawrence County. In 1996, the Kingsley Farm was conveyed to a trust, with Kiman, Kaleb, Kaland, Karen, and their then-minor sibling Kevin named as trust beneficiaries. Eventually, Kiman, Kaleb, and Kaland turned the Kingsley Farm into an organic farming operation and crop-spraying business, which the three brothers co-owned and operated. Kevin worked on the Kingsley Farm until 2008, when he and his now-wife Lisa left to start a competing crop-spraying business.

_____

[1]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

[2]This action involves several individuals who share the last name Kingsley. To avoid confusion, we will refer to those individuals by their first names.

According to Kiman, after Kevin's departure, Kevin and Lisa endeavored to steal the Kingsley Farm's customers, eliminate the Kingsley Farm as a competitor, and take over its businesses. Further, Kiman alleges that Kevin and Lisa have recruited others, including law enforcement officers with the Lawrence County Sheriff's Office (LCSO), to assist them in this endeavor.

On January 25, 2013, James Tyler, one of the employees of the Kingsley Farm, was charged with sexual misconduct involving two minors. On February 13, 2013, Tyler was released from jail after Kiman posted bond for him. Later in February, Lisa and Cynthia, Kaleb's then-wife, went to the LCSO to meet with Deputy Sheriff Chris Berry, the detective assigned to investigate Tyler's case. Deputy Berry recorded the meeting, which was later transcribed.

Lisa and Cynthia began the meeting by expressing to Deputy Berry their concerns about Tyler being released on bond and returning to the Kingsley Farm. Lisa commented that Kiman had "put his house up" to post Tyler's bond. Deputy Berry asked, "Is it [Kiman's] house though [that was used to post the bond]?"[3] Lisa responded that she planned to go online later that day to "look at who" had posted Tyler's bond. Deputy Berry responded, "Yeah, because you all have joint property out there." He noted, however, that if Kiman "put[] up his own home" to post the bond, he was allowed to do that. Lisa responded, "Of course he can, but we want to know for sure." Deputy Berry responded, "Right, because you need to – like I told you all when this all started, you need to protect yourself also."

---

[3]Although not explicitly stated, the transcript suggests that, at the time of the meeting, Lisa, Cynthia, and Deputy Berry did not yet know with certainty whether it was Kiman who had posted Tyler's bond.

-3-

Lisa then posed the following hypothetical to Deputy Berry: If someone were to report to Deputy Berry that Kiman had screamed at her and had threatened, "[W]e're going to get you and the prosecuting attorneys, we're all mad at you, we're going to get you," would that be "enough to get charges against [Kiman]"? Deputy Berry responded, "Well, I hope so. That's all I can say, you know. I'm steady working on it and you know I want [that] as much as you all do because [Kiman] needs to back off and let this thing ride out and I'm not seeing it happen."

Shortly thereafter, Lisa posed a second hypothetical to Deputy Berry: If Kiman and his wife, Darlene, were criminally charged for threatening "ladies," could Kiman and Darlene be arrested and taken away from the Kingsley Farm at the same time, and, if so, could Lisa and Cynthia, as property owners, then force Tyler off the Kingsley Farm? Deputy Berry responded that Lisa and Cynthia would have to "go through the courts" to do that. He explained that they would have "to get writs" which would take thirty days. Throughout the rest of the meeting, Deputy Berry repeatedly informed Lisa and Cynthia that they would need to go through the court system.

Later in the meeting, Lisa asked Deputy Berry, "Are we getting closer to getting Kiman?" Deputy Berry responded, "I think that we are," but "I've got to get my reports done [in Tyler's case] first." Deputy Berry went on to explain,

> I want to make sure I do this as best I can so that we can have the best case that we can put together and that's what I want to do and I have to do it one step at a time . . . . I want us to pursue this like a pit bull eating a rabbit. . . . If it turns out that we're not going to be able to do anything about it, I don't think that's the case, but all I do is gather information, but I gather information like a pit bull. I want you all to know that, that I'm working on this as hard as I can.

-4-

Sheriff Brad DeLay then joined the meeting. Lisa and Cynthia expressed to him their concerns about Tyler returning to the Kingsley Farm. The conversation then turned to threats Kiman and Darlene had allegedly made. Cynthia asked, "Can [Kiman and Darlene] not be arrested for that?" Sheriff DeLay explained,

> Basically we are allowed to arrest somebody if we witness the crime. That means literally Chris [Berry] has to be there . . . . If we're not there when it happens, the next process is you guys have to report it to us. We have to do the report. It has to go to the prosecutor to issue a warrant. We just can't go back right out and say, ["]Okay, you came in and said you were going to kill her, so I have to arrest you.["] We have to go through the process. Let me back up. We can do that, but if we do that, it's going to get thrown out because it wasn't a good arrest.

The conversation ended shortly thereafter.

On July 5, 2013, Deputy Sheriff Jon Ford received a call from his dispatcher directing him to respond to a call from Cynthia, who had reported to police that Kiman had assaulted her. Deputy Ford met with Cynthia at the police station in Miller, Missouri and obtained verbal and written statements from her. In her statements, Cynthia claimed that she and Kiman had an argument earlier that day at the Kingsley Farm and that Kiman tried to stab her with a yellow pocket knife. Cynthia explained that she used a taser on Kiman and then got into her vehicle, locked the doors, and began to drive away. Cynthia reported that, as she drove away, Kiman attempted to stab her tires with the yellow pocket knife but one of his employees, Marty Johnson, prevented him from doing so.

After obtaining verbal and written statements from Cynthia, Deputy Ford went to the Kingsley Farm to investigate Cynthia's allegations. He was accompanied by Deputy Sheriffs Cam Carter and Steve Vollmer. When the deputies arrived at the farm, they were met by Marty Johnson, who informed them that Kiman was flying an

-5-

airplane but would return shortly. In the meantime, Deputy Ford asked Deputy Carter to interview Johnson about the incident. After speaking to Johnson, Deputy Carter reported to Deputy Ford that Johnson had stated that "the incident was a family matter" and "that he did not want to get involved." No one else claiming to be a witness to the alleged incident came forward to Deputy Ford.

When Kiman returned to the Kingsley Farm, Deputy Ford spoke to him and found on his person a yellow pocket knife. Deputy Ford then arrested Kiman for the alleged assault of Cynthia and transported him to the Lawrence County jail. At the jail, Deputy Ford filled out a Prosecutor Referral Form and a Statement of Probable Cause. He placed the completed forms, along with copies of the police reports and Cynthia's written statement, in a tray to be forwarded to the Lawrence County Prosecutor's Office, with a request that those materials be considered in determining whether to criminally charge Kiman. Those materials were also turned over for assignment to an LCSO detective for any follow-up investigation which might be necessary. Deputy Ford had no further involvement in this matter.

The next day, on July 6, 2013, Deputy Berry was assigned as the detective to investigate Kiman's case. After reviewing the materials turned over by Deputy Ford, he determined that the only other witnesses identified in the police report were Cynthia's two minor children who were in her vehicle at the time of the incident. Pursuant to Deputy Berry's request, a case worker at the Children's Center of Southwest Missouri interviewed Cynthia's children on July 8, 2013. Deputy Berry was present for the interviews, but he did not participate in them in any way. The interviews were videotaped and copies of the tapes were then forwarded to the Prosecutor's Office. Deputy Berry did not interview any other witnesses, and he had no further involvement in this matter.

In August 2013, the Lawrence County Prosecutor recused himself from Kiman's case because of an association he had with Kiman. Patrick Sullivan was

appointed as the special prosecutor. Following his appointment, Sullivan reviewed the materials that had been sent to him by the LCSO. Sullivan also met with Cynthia. However, it was not until September 2015 that Sullivan filed state criminal charges against Kiman for assault in the second degree and armed criminal action. Sullivan's reason for the two-year delay was that he "was thinking about it." At no point prior to filing the criminal charges against Kiman did Sullivan ask the LCSO for additional information or any follow-up investigation.

On March 3, 2016, a preliminary hearing was held in Kiman's criminal case. Kiman's counsel conceded that probable cause existed for him to be bound over for trial. In September 2016, however, Kiman retained new counsel who met with Sullivan and provided him with a private investigator's summaries of his interviews with additional persons who had allegedly witnessed the incident, as well as a copy of the divorce decree that was entered in the divorce proceedings between Cynthia and Kaleb on September 30, 2016. After reviewing the divorce decree, Sullivan decided to dismiss the criminal complaint against Kiman because he felt the factual findings set forth in the divorce decree could be used to impeach Cynthia in Kiman's criminal case. The criminal complaint against Kiman was dismissed on November 16, 2016.

Following the dismissal of the criminal complaint, Kiman initiated an action against Sheriff DeLay, Deputy Berry, Deputy Ford, and Lawrence County (collectively, Appellees).[4] Relevant to this appeal, Kiman brought 42 U.S.C. § 1983 claims against Sheriff DeLay, Deputy Berry, and Deputy Ford, in their individual capacities, for false arrest in violation of the Fourth Amendment, reckless or intentional failure to investigate in violation of the Due Process Clause of the

---

[4]Kiman also named Cynthia, Lisa, Kevin, and seven other individuals as defendants in the action. However, by the time Sheriff DeLay, Deputy Berry, Deputy Ford, and Lawrence County filed their motion for summary judgment, they were the only defendants remaining in the action.

Fourteenth Amendment, and conspiracy to violate those constitutional rights; and against Lawrence County for its unconstitutional customs or policies.[5] Appellees moved for summary judgment on all claims, which the district court granted. The court found that the facts, viewed in the light most favorable to Kiman, did not make out a violation of Kiman's rights under the Fourth Amendment or the Fourteenth Amendment and, thus, Appellees were entitled to qualified immunity on those claims. Further, the court found that, because Kiman failed to demonstrate that he had suffered a constitutional deprivation as a result of the alleged conspiracy, Appellees were also entitled to qualified immunity on the § 1983 civil conspiracy claim. Finally, the court found that, absent an underlying constitutional violation by an individual officer, Lawrence County cannot be held liable under § 1983. This appeal follows.

II.

Kiman appeals the district court's adverse grant of summary judgment on each of his § 1983 claims, arguing that the court failed to view the record in the light most favorable to him and that the court's qualified immunity determinations were erroneous. We review de novo the district court's grant of summary judgment based on qualified immunity, taking the facts in the light most favorable to Kiman, the nonmoving party, and drawing all reasonable inferences in his favor. Lombardo v. City of St. Louis, 956 F.3d 1009, 1013 (8th Cir. 2020). "[T]he qualified immunity

_____

[5]Kiman also sued the officers in their official capacities and brought claims under Missouri common law. However, on appeal, Kiman does not challenge the district court's grant of summary judgment dismissing his § 1983 official-capacity claims. As to his common law claims, Kiman simply argues that the district court's dismissal of those claims was erroneous. Because "there was no meaningful argument on [Kiman's common law] claim[s] in his opening brief, [those claims are] waived." Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004).

standard . . . protect[s] all but the plainly incompetent or those who knowingly violate the law." Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) (internal quotation marks omitted). "In making a qualified immunity determination, we apply a two-prong inquiry: '(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" Lombardo, 956 F.3d at 1013 (quoting Mitchell v. Shearrer, 729 F.3d 1070, 1074 (8th Cir. 2013)). With this framework in mind, we address each of Kiman's claims on appeal.

A.

i.

Kiman first argues that the district court erred in concluding that Deputy Ford was entitled to qualified immunity on the Fourth Amendment false arrest claim. We begin our analysis by determining whether the facts alleged support Kiman's contention that Deputy Ford violated his Fourth Amendment right. "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Borgman v. Kedley, 646 F.3d 518, 522-23 (8th Cir. 2011). "Probable cause to make a warrantless arrest exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." Ulrich, 715 F.3d at 1059 (internal quotation marks omitted). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." Borgman, 646 F.3d at 523 (internal quotation marks omitted).

The undisputed facts show that, prior to arresting Kiman, Deputy Ford was told by his dispatcher that Cynthia had called the police to report that Kiman had assaulted her. Further, it is undisputed that Deputy Ford then obtained oral and written statements from Cynthia in which Cynthia alleged that: she and Kiman had an argument earlier that day at the Kingsley Farm; Kiman tried to stab her with a yellow pocket knife; Cynthia got into her car and, as she started to drive away, Kiman tried to stab her tires with the yellow pocket knife; and Marty Johnson prevented Kiman from stabbing Cynthia's tires.

While Kiman argues that Cynthia fabricated the incident, "officers are generally entitled to rely on the veracity of information supplied by the victim of a crime . . . ." Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816-17 (8th Cir. 2010) (alteration omitted) (quoting Peterson v. City of Plymouth, 60 F.3d 469, 474-75 (8th Cir. 1995)). Moreover, Kiman's attempts to show that it was nonetheless unreasonable for Deputy Ford to rely on Cynthia's statements are insufficient. First, Kiman argues that it was unreasonable for Deputy Ford to consider Cynthia credible because Deputy Ford knew that in 2010 Cynthia was suspected of having deliberately damaged another person's vehicle. However, an alleged victim's statements to an officer are not automatically rendered untrustworthy, so as to negate probable cause, simply because the officer has knowledge of the alleged victim's criminal history. Anderson v. Cass Cnty., 367 F.3d 741, 746 (8th Cir. 2004) (holding that alleged victim's statement to deputies that she had been assaulted was not rendered untrustworthy by deputies' knowledge that alleged victim had criminal history of writing bad checks, that deputies had been to victim's residence on "police business" before, and that victim had attempted to flee bondsman). Deputy Ford's knowledge that Cynthia had previously been suspected of deliberately damaging another person's vehicle "does not establish that on the [day] of the alleged assault [Cynthia] was untrustworthy." Id.

-10-

Second, Kiman broadly asserts that Deputy Ford had improper motives in arresting Kiman. Specifically, he argues that, prior to Kiman's arrest, Deputy Ford faced "on-going pressure" from Lisa and Cynthia to arrest Kiman and that Deputy Ford knew Cynthia had "ulterior motives" and had fabricated the assault. However, Kiman fails to point to any facts or evidence in the record that would substantiate these allegations. See Reed v. City of St. Charles, 561 F.3d 788, 790-91 (8th Cir. 2009) (explaining that, on summary judgment, a plaintiff may not simply cite "unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or fantasy" (citations and internal quotation marks omitted)). Even assuming that Cynthia's statements during the February 2013 meeting with Deputy Berry and Sheriff DeLay are sufficient to show that she had "ulterior motives" in reporting the alleged assault to the police five months later, Deputy Ford was not present at that meeting. Further, Kiman has not presented any evidence to suggest that Deputy Ford even knew that meeting took place. Moreover, while Kiman makes much of the fact that Cynthia and Deputy Ford attended school together and were friends, those facts in no way create a reasonable inference Cynthia had ever spoken to Deputy Ford about Kiman prior to the day of the alleged assault, that Deputy Ford knew of Cynthia's purported ulterior motives, or that Cynthia's account of the assault was fabricated. See ACT, Inc. v. Sylvan Learning Sys., Inc., 296 F.3d 657, 666 (8th Cir. 2002) (noting that non-moving parties are not entitled "to the benefit of unreasonable inferences"). And, to the extent Kiman argues his arrest was motivated by Deputy Ford's personal animosity toward him, "the subjective motivations of the arresting police officer[] are irrelevant" where, as here, there is an objectively reasonable basis for finding arguable probable cause. Anderson, 367 F.3d at 748 n.8.

Further, other evidence corroborated Cynthia's statements, providing indicia of reliability. First, it is undisputed that, prior to arresting Kiman, Deputy Ford found on Kiman's person a pocket knife matching Cynthia's description of the pocket knife Kiman allegedly used to assault her earlier that day. See Joseph v. Allen, 712 F.3d 1222, 1227 (8th Cir. 2013) (finding arguable probable cause where victim's statements were corroborated by physical injuries and other evidence at the scene). Second, the record shows that, prior to the arrest, Deputy Carter reported to Deputy Ford that Marty Johnson had stated that "the incident was a family matter."[6] A reasonable officer could consider this statement as additional corroboration of Cynthia's statement, because it provides some confirmation that there had, in fact, been an "incident" between Kingsley family members earlier that day. And while Kiman argues that, two months after the incident, Johnson contradicted himself by testifying that Kiman did not assault Cynthia, "probable cause is determined at the moment the arrest was made, [and] any later developed facts are irrelevant to the probable cause analysis for an arrest." Gilmore v. City of Minneapolis, 837 F.3d 827, 833 (8th Cir. 2016) (alteration in original) (quoting Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008)) (internal quotation marks omitted). Accordingly, any statement later made by Johnson is irrelevant in determining whether Deputy Ford had arguable probable cause to arrest Kiman on the day in question.

---

[6]On appeal, Kiman attempts to demonstrate that a genuine issue of material fact exists as to whether any law enforcement officer actually spoke to Johnson. Kiman points to a private investigator's summary of a conversation he had with Johnson some time between 2016 and 2019. The private investigator's summary states that Johnson told him that, to the best of his recollection, he had not been contacted or interviewed by any law enforcement officer. However, the private investigator's summary of his conversation with Johnson constitutes inadmissible hearsay, which "may not be used to defeat summary judgment." Brewington v. Keener, 902 F.3d 796, 802 (8th Cir. 2018). Accordingly, this evidence does not create a genuine issue for trial.

Finally, Kiman contends that Deputy Ford lacked arguable probable cause to arrest Kiman because he failed to interview other known witnesses prior to making the arrest. "[A]n officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect." Borgman, 646 F.3d at 523 (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999)). In Kuehl, this Court found that the officer in that case lacked arguable probable cause to arrest a store owner for assaulting a customer where the officer declined to interview the only person who had witnessed the entire altercation and who would have revealed that the customer, not the store owner, was the aggressor. 173 F.3d at 648-51. In this case, however, Kiman has failed to demonstrate that minimal further investigation would have exonerated him. Contrary to Kiman's assertion, the record demonstrates that the only eyewitnesses known to Deputy Ford at the time of Kiman's arrest were Marty Johnson and Cynthia's two minor children. As discussed, Deputy Carter informed Deputy Ford that he had spoken to Johnson. And while the officers did not interview Cynthia's two minor children prior to making the arrest, there is nothing in the record that suggests that the children would have provided the officers with exonerating information. To the contrary, when the children were interviewed by a case worker just three days after the incident, they largely corroborated Cynthia's statement. To the extent Kiman asserts that a private investigator found additional witnesses in 2016, there is no indication that those witnesses could have been identified with "minimal further investigation." Accordingly, Deputy Ford was not required to conduct further interviews prior to arresting Kiman.

In any case, "[t]he law does not require law enforcement officers to conduct a perfect investigation to avoid suit for false arrest," Joseph, 712 F.3d at 1228, and "[t]he officers had no duty to conduct further investigation once they had []arguable[] probable cause to arrest," Clayborn v. Struebing, 734 F.3d 807, 809 (8th Cir. 2013). Based on Cynthia's oral and written statements to Deputy Ford, Johnson's statement, and the corroborating physical evidence of a yellow pocket knife found on Kiman's

-13-

person that same day, it was objectively reasonable for Deputy Ford to believe that Kiman had assaulted Cynthia. See Gilmore, 837 F.3d at 833 (finding that victim's 911 call and in-person account to officers would give the officers at least arguable probable cause for arrest).

We conclude that Deputy Ford had at least arguable probable cause to arrest Kiman. Accordingly, Deputy Ford is entitled to qualified immunity on Kiman's Fourth Amendment false arrest claim.

ii.

We turn to whether Sheriff DeLay and Deputy Berry are entitled to qualified immunity on Kiman's Fourth Amendment false arrest claim. "[Section] 1983 liability is personal." Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) (en banc). "To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation." White v. Jackson, 865 F.3d 1064, 1081 (8th Cir. 2017). The record is devoid of any evidence indicating that Sheriff DeLay and Deputy Berry were involved in or present for Kiman's arrest. In fact, there is nothing in the record to suggest that, prior to Kiman's arrest, Sheriff DeLay or Deputy Berry had any knowledge that Cynthia had reported being assaulted by Kiman or that Deputy Ford had been dispatched in response. Accordingly, Sheriff DeLay and Deputy Berry are likewise entitled to qualified immunity on the Fourth Amendment false arrest claim.

B.

Next, we consider whether Sheriff DeLay, Deputy Berry, and Deputy Ford (the Officers) are entitled to qualified immunity on Kiman's Fourteenth Amendment substantive due process claim. "To establish a substantive due process violation, [Kiman] must demonstrate that a fundamental right was violated and that [the

-14-

Officers'] conduct shocks the conscience." Folkerts v. City of Waverly, 707 F.3d 975, 980 (8th Cir. 2013). Where, as here, the plaintiff's substantive due process claim is based on a failure to investigate, the plaintiff "must show that [the officers] intentionally or recklessly failed to investigate, thereby shocking the conscience." Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009) (internal quotation marks omitted). Whether conduct shocks the conscience "is a question of law to which we apply a rigorous standard." Johnson v. Moody, 903 F.3d 766, 773 (8th Cir. 2018). "Investigators shock the conscience when they (1) attempt to coerce or threaten the criminal defendant, (2) purposefully ignore evidence of the defendant's innocence, or (3) systematically pressure to implicate the defendant despite contrary evidence." Folkerts, 707 F.3d at 981.

Kiman argues that Deputy Ford and Deputy Berry violated his right to due process by failing to interview other potential witnesses. Specifically, he contends that the arrest reports state that "Joseph Oczkus" and "other persons" were at the scene, but that the record is devoid of any evidence that either Deputy Ford or Deputy Berry attempted to interview Oczkus or tried to ascertain the identities of these "other persons." As an initial matter, contrary to Kiman's assertion, the arrest reports do not state that "other persons" were at the scene. Rather, the arrest reports indicate that the only individuals who witnessed the incident between Cynthia and Kiman were Johnson and Cynthia's two children, all of whom were interviewed to some extent. And while Deputy Ford's arrest report does state that Oczkus was at the Kingsley Farm when he and the other deputies arrived to investigate, there is nothing in the record to suggest that Deputy Ford had any reason to believe that Oczkus had witnessed the incident or that Oczkus possessed exculpatory information. Cf. Kuehl, 173 F.3d at 651 (finding that, in the context of a Fourth Amendment claim, the officer was not entitled to qualified immunity where he "refused" to interview the only person who had witnessed the entire incident and who would have negated probable cause).

-15-

Similarly, even if there were other witnesses at the scene, Kiman does not present any evidence to suggest that Deputy Ford or Deputy Berry knew about, but declined to interview, these additional witnesses. Thus, any failure by the deputies to interview additional witnesses was, at most, negligent, which is insufficient to shock the conscience. See Akins, 588 F.3d at 1184 ("An officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct."); Clemmons v. Armontrout, 477 F.3d 962, 966 (8th Cir. 2007) (explaining that "[e]ven allegations of gross negligence fail to establish a constitutional violation" and finding no violation of due process where, although plaintiff presented evidence that investigator failed to interview eyewitnesses, plaintiff offered no explanation for why such failure was reckless or intentional as opposed to merely negligent).

Kiman argues that Deputy Berry denied him due process by closing his investigation after just three days. The record shows that, during those three days, Deputy Berry reviewed the materials turned over by Deputy Ford, including the copies of the police reports and Cynthia's written statement; that he determined that the only adult witness identified in those materials, Marty Johnson, had stated that the "incident" was a family matter and did not want to get involved; that he arranged for the only other witnesses identified in those materials, Cynthia's two children, to be interviewed by a case worker at the Children's Center of Southwest Missouri; and that he observed those interviews and then forwarded the recordings of them to the prosecutor. While Kiman argues that certain parts of the children's interviews contradicted Cynthia's statements and that, therefore, Deputy Berry should have personally conducted additional interviews of the children, "[e]vidence that investigators ignored factual inconsistencies in the evidence . . . is insufficient to establish that they investigated in a reckless, conscience-shocking manner." Johnson, 903 F.3d at 773. Thus, Deputy Berry's conduct in investigating the alleged assault, "however questionable or incomplete, was not [conscience]-shocking behavior as a matter of law." Id.

Finally, Kiman argues that he has established a due process violation because the record supports a reasonable inference that the Officers were under "systematic pressure" from Lisa and Cynthia to "frame" Kiman. As an initial matter, while our precedent holds that evidence of "systematic pressure" shocks the conscience when investigators, themselves, "exercise[] systematic pressure to procure [an individual's] conviction despite the unreliability of the evidence that [the individual] was involved," White v. Smith, 696 F.3d 740, 758 (8th Cir. 2012), it is not clear whether an investigator's behavior is conscience-shocking as a matter of law when he is the target of systematic pressure by a third party. In any case, we need not decide that issue because the transcript of the February 2013 meeting, even when construed in favor of Kiman, does not reasonably support a finding that Deputy Berry and Sheriff DeLay were pressured to frame Kiman. Rather, the transcript shows that Lisa and Cynthia informed Deputy Berry and Sheriff DeLay of their fears and concerns about Kiman and their allegations against him. Throughout the meeting, both Deputy Berry and Sheriff DeLay repeatedly informed Lisa and Cynthia that they could not arrest Kiman based solely on these allegations, that there is a procedure that officers must follow, and that Lisa and Cynthia would need to go through the court system to obtain any immediate protection from Kiman.

At most, Kiman has presented evidence that the Officers failed to strictly follow LCSO procedure, to ascertain the identities of potential additional witnesses, and to explore possible inconsistencies; however, none of these purported inadequacies in the investigation amount to conscience-shocking behavior, thereby establishing a due process violation. Accordingly, we conclude that Sheriff DeLay, Deputy Berry, and Deputy Ford are entitled to qualified immunity on Kiman's Fourteenth Amendment substantive due process claim for failure to investigate.

-17-

## C.

Next, we address Kiman's § 1983 civil conspiracy claim against the Officers. To prove a § 1983 conspiracy claim against a particular officer, Kiman must show that the officer "conspired with others to deprive [Kiman] of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured [Kiman]." Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999). Moreover, "the plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." Id.; see Henry v. Johnson, 950 F.3d 1005, 1015 (8th Cir. 2020) (affirming grant of summary judgment on § 1983 civil conspiracy claim where plaintiff failed to establish a constitutional deprivation); Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984) ("[I]t remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient. . . . Without a deprivation of a constitutional right or privilege, [the defendant] has no liability under § 1983."). Therefore, where the evidence is "insufficient as a matter of law to support a finding that plaintiff suffered a constitutional deprivation as a result of the alleged conspiracy," the plaintiff's § 1983 civil conspiracy claim must fail. Askew, 191 F.3d at 957.

Because we have already determined that Kiman failed to establish that he was deprived of a constitutional right or privilege, his § 1983 civil conspiracy claim must fail as a matter of law. The Officers are therefore entitled to qualified immunity on Kiman's § 1983 civil conspiracy claim.

D.

Finally, we turn to Kiman's <u>Monell</u>[7] claim against Lawrence County. Under <u>Monell</u>, "a local government is liable under § 1983 for its policies that cause constitutional torts." <u>McMillian v. Monroe Cnty.</u>, 520 U.S. 781, 785 (1997) (citing <u>Monell</u>, 436 U.S. at 694). "It follows that, absent a constitutional violation by a [county] employee, there can be no § 1983 or <u>Monell</u> liability for the [county]." <u>Whitney v. City of St. Louis</u>, 887 F.3d 857, 861 (8th Cir. 2018). Because we have already determined that the individual officers' conduct did not violate Kiman's constitutional rights, Lawrence County is entitled to summary judgment on Kiman's <u>Monell</u> claim.

III.

For the foregoing reasons, we affirm the judgment of the district court.

_____

[7]<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).