# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1646

_____

Eagle Technology; William Bakker

*Plaintiffs - Appellants*

v.

Expander Americas, Inc.; Expander System Global, AB

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 14, 2015
Filed: April 22, 2015

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Eagle Technology, Inc. ("Eagle") and its sole owner, Willem F. Bakker, brought suit against Expander Americas, Inc. ("Expander Americas") and its parent company, Expander System Global, AB ("Expander Global"), after each company terminated contracts with Eagle and Bakker respectively. As to Expander Global, the

district court[1] concluded that it could not assert personal jurisdiction because Expander Global is a Swedish corporation without sufficient contacts with the State of Missouri. The court granted summary judgment in favor of Expander Americas on the remaining contract claims based on the statute of frauds. Eagle and Bakker appeal both rulings. We affirm.

## I. *Background*

Expander Global conducts no business and functions merely as a holding company for its wholly owned subsidiary, Expander System Sweden, AB ("Expander Sweden"), another Swedish corporation. Expander Sweden, in turn, wholly owns Expander Americas as its subsidiary. As their names suggest, Expander Sweden and Expander Americas primarily conduct their business in Europe and the United States respectively, manufacturing industrial pins used in heavy machinery.

On February 18, 2010, Eagle entered into an Independent Contractor Agreement (the "Agreement") with Expander Americas to provide consulting services. The Agreement contained the following relevant provisions:

4.      Term and Termination

     A.      The Term of this Agreement shall begin this 1st day of January, 2010, and shall continue for a period of one (1) year; thereafter, this Agreement shall be automatically renewed for successive periods of one (1) year each, unless terminated as provided herein.

     B.      Either party may terminate this Agreement at any time by mutual agreement of the parties hereto or providing the other party with ninety (90) days prior written notice . . . .

---

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

* * *

13.     Governing Law. The construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the State of Arizona.

* * *

15.     Miscellaneous. No amendment or modification of this Agreement shall be effective unless executed in writing by the parties hereto. . . . This Agreement constitutes the entire agreement of the parties and is intended as a complete agreement of the promises, representations, negotiations, discussions, and agreements that may have been made in connection with the subject matter hereof, and supersedes any prior oral or written agreement. . . .

A document entitled Exhibit A was attached to the Agreement. It provided that Expander Americas would compensate Bakker at a rate of $4,583.33 per month.

These consulting services soon increased, and Expander Americas requested that Eagle become its Chief Information Officer (CIO) and Chief Financial Officer (CFO) in March 2010. On May 10, 2010, Bakker sent an email to Expander Americas's Chief Executive Officer (CEO), Ron Randen, negotiating modifications to the existing Agreement in light of Eagle's new position. In pertinent part, Bakker's email stated "[a]ttached the first draft of half of the Plan. . . . Resume and Exhibit B of our service agreement to continue the dialogue on me joining Expander fulltime." Exhibit B stated that it "replace[d] Exhibit A" and would become effective on "6/1/2010."

Also, as part of the new arrangement, Exhibit B provided that Expander Americas was to raise Eagle's compensation rate to $7,500 per month. Exhibit B also stated that "[t]he term of this agreement is 24 months (5/31/2012)." Randen responded the next day, asking if Bakker could "focus more on CFO and CIO

-3-

functions and activities in the 'Professional Experience'? All is good but this focus will help with the board for global responsibilities." Randen's electronic signature, which included his title as CEO of Expander Americas, ended the email. Bakker concedes that the parties never executed Exhibit B. Randen later admitted in a deposition, however, that he believed that Exhibit B became operational and replaced Exhibit A's terms. Further, Expander Americas paid Eagle $7,500 every month pursuant to Exhibit B until the contract was terminated.

The Agreement soon led to a relationship between Expander Global—parent of Expander America—and Bakker. In November 2010, after working together for several months, Expander Global's CEO, Roger Svensson, sent an email to all employees of the Expander companies announcing that Bakker had been appointed as Expander Global's CIO and CFO. There was never any written employment agreement memorializing this relationship. Bakker performed several of his duties from his home near St. Louis, Missouri. These duties included acting as a manager on projects to improve the financial and information technology systems of the Expander companies and serving as the secretary of the Expander Global Board of Directors and the Expander executive team. As to contacts between the foreign companies and the State of Missouri, Bakker specifically contends that he attended a planning meeting in St. Louis with representatives from both Expander Sweden and Expander Americas. He also asserts that he participated in telephone conference calls and had several hundred contacts via phone and email with employees of the Expander companies and outside consultants.

On June 19, 2011, Expander Global terminated Bakker from his position as CIO and CFO. Less than a week later, Expander Americas also terminated its agreement with Eagle in writing. The termination letter, signed by Randen, stated that Bakker had "indicated that if [he] did not receive higher compensation from Expander, [he] would go elsewhere and no longer provide the services as set forth in [the Agreement]." Based upon "an email from Roger Svensson to [Bakker],

confirming that there would not be an increase in compensation[] . . . [Expander Americas] . . . decided to accept [Bakker's] decision to terminate the agreement between [the] companies." The next month, in July 2011, Randen himself was let go from his CEO position at Expander Americas.

Eagle then filed the instant suit against Expander Americas seeking damages alleging breach of contract and promissory estoppel; Bakker filed suit against Expander Global for quantum meruit. The district court dismissed the quantum meruit action pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. Expander Global argued that it did not have the requisite minimum contacts with Missouri to be subject to the Missouri Long-Arm Statute or to satisfy due process. While Bakker had alleged various facts in his complaint, such as Expander Global sending employees to Missouri, the district court found that Bakker had not met his burden of rebutting Expander Global's claims by "'proving facts supporting personal jurisdiction'" with "'affidavits and exhibits presented with the motions and in opposition thereto.'" (Quoting *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010).) Without such evidence, the court found that it could not assert personal jurisdiction over Expander Global because it did not have any contacts with Missouri. "It was not licensed to do business in the state; it did not advertise within the state; it did not send employees to the state; no money was received or sent to the state; it quite frankly had no presence within the State of Missouri."

The district court also granted summary judgment in favor of Expander Americas on the remaining claims. Following the parties' choice-of-law provision in the Agreement, the court analyzed whether Exhibit B satisfied the Arizona statute of frauds. As a preliminary matter, the court found that the statute of frauds applied under Arizona case law because Exhibit B's 24-month term meant that this contract modification could not be performed within one year. *See* Ariz. Rev. Stat. § 44-101.5. In doing so, the court rejected Eagle's only argument on this matter—that Randen's

deposition admission should be treated as a judicial admission to prove there was a contract and that consequently, the statute of frauds should not apply because Randen admitted that Exhibit B constituted an operative modification to the Agreement. The court rejected this argument pursuant to Arizona law because only attorneys or parties can make such judicial admissions. At the time of Randen's deposition, he was no longer an employee of Expander Americas, and thus, he was never a party in the litigation. As a result, the court found Exhibit B was covered by the statute of frauds. Next, the court found that Exhibit B did not satisfy the statute of frauds's writing requirement because Expander Americas, as party to be charged, did not sign the document. The court rejected Eagle's argument that Randen's electronic signature on his responding email constituted the necessary execution of Exhibit B, which was attached to Bakker's email. To the contrary, the district court found that the email exchange showed that Randen and Bakker were still in negotiation and that Exhibit B had yet to be accepted by the parties.

## II. *Discussion*

On appeal, Eagle and Bakker argue that the district court erred by finding it could not assert personal jurisdiction over Expander Global and by granting summary judgment in favor of Expander Americas on the remaining claims.

### A. *Personal Jurisdiction Over Expander Global*

We review a district court's decision finding lack of personal jurisdiction de novo. *Romak USA, Inc. v. Rich*, 384 F.3d 979, 983 (8th Cir. 2004). "We approach our analysis of personal jurisdiction on two levels, first examining whether the exercise of jurisdiction is proper under the forum state's long-arm statute. If the activities of the non-resident defendant satisfy the statute's requirements, we then address whether the exercise of personal jurisdiction comports with due process." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387–88 (8th Cir. 1991) (citations omitted); *see also Romak*, 384 F.3d at 984. Relevant to this appeal, the Missouri long-

arm statute provides for personal jurisdiction over parties who transact business and make contracts within Missouri. Mo. Rev. Stat. § 506.500(1)–(2).

"Because 'the Missouri long-arm statute authorizes the exercise of jurisdiction over non-residents to the extent permissible under the due process clause, we turn immediately to the question whether the assertion of personal jurisdiction would violate the due process clause.'" *Romak*, 384 F.3d at 984 (quoting *Porter v. Berall*, 293 F.3d 1073, 1075 (8th Cir. 2002)). We employ a five-factor test to determine whether asserting personal jurisdiction over a party comports with due process: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) Missouri's interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012).

Expander Global argues that it lacks the requisite contacts with Missouri to fulfill factors (1)–(3). It contends that its only contact with the state of Missouri is its business relationship with Bakker; it argues that such a relationship, on its own, fails to justify imposing personal jurisdiction. We agree. In *Scullin Steel Co. v. National Railway Utilization Corp.*, we affirmed the district court's dismissal of an action for lack of jurisdiction over a South Carolina corporation even though the corporation contracted with a St. Louis factory to manufacture products in Missouri, delivered products to the St. Louis factory, and sent payment for services to the factory. 676 F.2d 309, 313–14 (8th Cir. 1982). Like the present case, the non-resident corporation in *Scullin Steel* was "not authorized to do business in Missouri, [had] no office . . . in Missouri, own[ed] no real property in Missouri, and [had] no agent for service of process or for any other purpose in Missouri." *Id.* at 310; *see also Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226–27 (8th Cir. 1987) (finding that South Dakota courts could not assert personal jurisdiction over a New York law firm that did not

have any employees that resided in South Dakota or were licenced to practice law in South Dakota, did not advertise there, and did not actively seek out clients there).

Bakker points to the daily emails, phone calls, and other communications that he had with personnel from all Expander companies that were directed to his residence in Missouri to argue that Expander Global did have minimum contacts with the state. This argument is unavailing because telephone calls, written communications, and even wire-transfers to and from a forum state do not create sufficient contacts to comport with due process such that a foreign corporation could "reasonably anticipate being haled into court there." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) (quotation omitted); *see also Porter*, 293 F.3d at 1076 ("Contact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause." (citation omitted)); *Burlington Indus. v. Maples Indus.*, 97 F.3d 1100, 1103 (8th Cir. 1996) (holding that 100 telephone calls by the defendant to the plaintiff were "insufficient, alone, to confer personal jurisdiction" (citation omitted)). Accordingly, Bakker has not carried his burden of establishing a prima facie case that federal courts in Missouri can assert personal jurisdiction over Expander Global.

B. *Exhibit B's Enforceability Under the Arizona Statute of Frauds*
"We review *de novo* a district court's grant of summary judgment, affirming if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 849–50 (8th Cir. 2014) (quotations and citations omitted). We give the non-moving party "the benefit of all reasonable inferences supported by the evidence," but the non-moving party "has the obligation to come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 850 (quotation omitted).

"Federal courts sitting in diversity apply the choice-of-law rules of the forum state. Under Missouri law, a choice-of-law clause in a contract generally is enforceable unless application of the agreed-to law is contrary to a fundamental policy of Missouri." *Cicle v. Chase Bank USA*, 583 F.3d 549, 553 (8th Cir. 2009) (quotations and citations omitted). Because the parties contracted to have Arizona law control, we analyze the Arizona statute of frauds to determine whether Exhibit B modified the operative terms of the Agreement.

The Arizona statute of frauds, in relevant part, provides the following:

> No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized:
>
> * * *
>
> 5. Upon an agreement which is not to be performed within one year from the making thereof.

Ariz. Rev. Stat. § 44-101.

Eagle first argues that the statute of frauds should not apply because the Agreement's termination provision (paragraph 4.B) created a possibility that the contract *could* have been completed in one year.[2] Eagle did not raise this argument before the district court. It is well settled that we will not consider an argument raised for the first time on appeal. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558

---

[2]Ironically, Eagle did not raise its original argument before the district court on appeal: that the statute of frauds does not apply because of the judicial admission exception. Because Eagle has not raised this argument before this court, we consider the argument waived.

F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Smith v. City of Des Moines, Iowa*, 99 F.3d 1466, 1473 (8th Cir. 1996) ("We will not reverse a grant of summary judgment on the basis of an argument not presented below." (citation omitted)). Accordingly, we decline to consider Eagle's new argument.[3]

Eagle next argues that Exhibit B satisfies the writing requirement of the statute of frauds. Eagle contends that Randen's email, stating that "All is good" and signed with his electronic signature, is enough to satisfy the writing requirement. Eagle is correct when asserting that emails that contain the material terms of an agreement that are signed with electronic signatures similar to Randen's have been held to satisfy the statute of frauds. In such cases, however, the statements in the emails were not ambiguous as to their application to an attached agreement. *See, e.g.*, *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295–96 (7th Cir. 2002) (finding that emails with the sender's name was enough to satisfy the statute of frauds in a UCC case); *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1362 (Fed. Cir. 2005) (finding that an email signature satisfied the California statute of frauds in an email that only contained the material terms of a proposed agreement).

---

[3]In its Reply Brief, Eagle argues that this new argument should be considered on appeal because the district court's reasoning that the statute of frauds applied—because Exhibit B's 24-month term meant that it could not be performed within one year—had not been raised by the parties in their motion papers. Upon review of the record, the Expander defendants argued that the statute of frauds should apply for this very reason in their Memorandum of Law in Support of their Motion for Partial Summary Judgment; Eagle simply chose not to reply to this argument in its opposition. In any case, if Eagle was truly concerned about having an opportunity to contest the district court's reasoning, it could have done so in a Rule 59(e) or Rule 60(b) motion to correct what Eagle perceived was a misapplication of the law. Had it done so, Eagle could have contested the district court's reasoning and preserved this argument for appeal.

This case, however, contains an additional element because Randen's "All is good" comment is ambiguous as to which of the several documents attached to Bakker's email he was referring: (1) "the first draft of half of the Plan"; (2) Bakker's resume; or (3) "Exhibit B of our service agreement to *continue the dialogue* on me joining Expander fulltime." (Emphasis added.)[4] Further, Randen's "All is good" statement occurred as he commented on Bakker's resume. Therefore, Randen's statement does not provide a sufficiently clear declaration of approval of the proposed agreement to satisfy the statute of frauds. Thus, we find that Randen's "All is good" statement is ambiguous as to whether it specifically acts as a stamp of approval on Exhibit B.[5]

In an attempt to get over this hurdle, Eagle again raises a new argument on appeal. Eagle argues that Randen's deposition testimony—in which he admitted that he believed Exhibit B became the operative terms of the Agreement—should be used to show he had the requisite *intent* to be bound. Thus, relying on this admission, Eagle argues that the writing requirement of the statute of frauds is satisfied with his email and electronic signature block.

Below, Eagle did not use Randen's deposition testimony to show intent in order to show that his email *satisfies* the statute of frauds. Rather, Eagle used Randen's deposition testimony to seek a judicial admission to show that the statute of frauds *did not apply* at all. As noted above, the inquiry into the statute of fraud's application

---

[4]Bakker's own language shows that his initial email was not an offer, but rather an invitation to continue negotiations. Thus, Randen's response could not be considered a binding acceptance because Bakker's email was not a formal offer.

[5]While it is a general rule that ambiguous language in an agreement should be construed against the drafter and in favor of the other party, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–63 (1995), Randen's language is not a part of the agreement at issue; instead, it is a statement that is ambiguous as to whether it applies to the agreement at issue.

is a preliminary question that is separate and apart from the inquiry into whether the statute of frauds has been satisfied. Therefore, Eagle's usage and argument of Randen's deposition testimony in the court below—to argue the preliminary application question—is materially different from their usage and argument of Randen's deposition testimony before this court—to make an "intent to be bound" argument that the statute of frauds's writing requirement is satisfied. We decline to consider this new argument not presented to the district court.

Alternatively, Eagle also argues that Expander America's partial performance satisfies the writing requirement. Eagle highlights Randen's approval and signatures on Eagle's invoices that billed for $7,500 every month for nearly a year before the Agreement was ultimately terminated. Eagle argues that Randen's approval of such invoices shows intent to be bound by the terms of Exhibit B, which modified the original payment terms in Exhibit A from $4,583.33 to $7,500 per month. This argument is unavailing under Arizona law because partial performance can only be utilized when seeking an equitable remedy. "[W]here a party attempting to enforce an oral agreement seeks an equitable remedy, such as specific performance, the equitable doctrines of estoppel and part performance are available to him. Where he seeks only a legal remedy, such as money damages for breach, they are not." *William Henry Brophy Coll. v. Tovar*, 619 P.2d 19, 23 (Ariz. Ct. App. 1980); *see also Rudinsky v. Harris*, 290 P.3d 1218, 1224 (Ariz. Ct. App. 2012) (citing *Tovar* in rejecting the plaintiff's argument that partial performance should satisfy the Arizona statute of frauds). Therefore, Eagle's exclusive request for legal damages forecloses its partial performance argument. Consequently, Eagle has failed, as a matter of law, to show that Randen's email and subsequent signing of checks and invoices in partial performance satisfies the writing requirement of the statute of frauds.

### III. *Conclusion*
For the reasons stated herein, we affirm.

_____