# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-1119
_____

Candi Walz, individually; Timothy Walz; Tanner Walz

*Plaintiffs - Appellants*

v.

Brian Randall, in his individual and official capacities; Joseph Quandt, in his individual and official capacities; Dennis Kucera, as Sheriff of Tama County, in his individual and official capacities; Tama County, Iowa

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids
_____

Submitted: January 13, 2021
Filed: June 29, 2021
_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.
_____

KELLY, Circuit Judge.

In September 2016, Tanner Walz, who was then 15 years old, was arrested by Tama County Sheriff's deputies on charges that were later dismissed. Two years later, his parents Candi and Timothy Walz filed suit on his behalf against the arresting

deputies, as well as the Tama County Sheriff and Tama County, alleging violations of 42 U.S.C. § 1983 and Iowa state law. The defendants moved for summary judgment on all claims, and the district court[1] granted their motion. We affirm.

I.

The events leading to Tanner's[2] arrest began on the evening of Monday, September 26, 2016. On-duty Tama County Sheriff's Deputies Brian Randall and Joseph Quandt were in a restaurant parking lot, having just finished their dinner break. As they walked toward their car, a woman named Angela[3] drove up and told them that her 16-year-old daughter Haley, who was in the car with her, had been raped two days earlier. Angela explained that Haley had three boys over at their house on Saturday night and that one of the boys, Tanner Walz, had assaulted Haley. Haley told the deputies that the assault took place in her bedroom and that she had not washed the clothes she had been wearing or the linens that were on her bed that night. The deputies advised Angela to take Haley to the hospital and not to ask her any more questions about the incident. First, though, the deputies accompanied Angela and Haley to the house to collect Haley's linens and clothing. Angela then drove Haley to the hospital, where Haley was examined by a sexual assault nurse who collected a rape kit.

_____

[1]The Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge for the Northern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

[2]Because Tanner, Candi, and Timothy Walz were all involved in the events at issue, we refer to each by their first name for clarity.

[3]To protect the identities of Angela and her daughter, who are not parties to this case, we refer to both by their first names only and use the pseudonym Haley to refer to Angela's daughter.

The following night, Deputies Quandt and Randall interviewed Angela at the sheriff's station. Angela explained that she first found out about the alleged rape the previous day, when she saw a message on Haley's phone from Tanner's girlfriend. In the message, the girlfriend asked Haley about a rumor that Haley had slept with Tanner that Saturday night. Angela asked Haley if the rumor was true, and Haley responded that it was. Haley told her mother that, on Saturday, Tanner had called her and asked if he could come over to her house. Haley initially said no, but eventually she allowed him to come over. Angela said that she and Haley then dropped the subject for a time.

Later that day, Angela continued, she and Haley were in the car together, and Angela called her husband (Haley's stepfather) to talk about what Haley had told her. Angela told her husband that boys had been at their house on Saturday night, including "the one guy you don't like that is not allowed at our house," referring to Tanner. Angela and Haley decided to drive home, discuss the situation, and call the police if they "needed to." As she drove, Angela asked Haley if she and Tanner had used protection. Haley said they had not. Angela told the deputies that she then slammed on the brakes and said, "Are you kidding me? Are you flipping kidding me?" Haley responded, "I asked him if he had anything, he told me no. I said, 'Then we're not doing anything,' and he did it anyway." At that point, Angela said, she believed Haley had been raped, and she was "furious." She pulled into the parking lot of the restaurant where Deputies Randall and Quandt were eating, having noticed their squad car earlier, and told them that her daughter had been assaulted.

Angela went on to offer the deputies more information about Tanner. She described him as a classmate of Haley's and a troublemaker, whom Haley had tried to befriend the previous year. Angela said she did not like Tanner but had tried to give him the benefit of the doubt. At the end of the previous school year, Tanner came to their house for a bonfire, where he shoved another boy. Afterward, Angela's husband told Tanner he was no longer welcome at their house.

-3-

Angela also provided the names of other people who might have information about what happened between Haley and Tanner. She said two other boys were at the house with Tanner and Haley that night. Haley had told her the two boys were in another room when the rape occurred and were "not involved in the sexual part of it." Angela commented that they may have been in the "wrong place" at the "wrong time," but "if they were in on the conversation they knew what the hell was going on." Angela added that Haley had spoken to a friend about the incident and that Haley's ex-boyfriend had heard the rumor that Haley and Tanner had slept together and believed that Tanner was drunk that night. On Monday, Haley also spoke to three different employees at her school. To one of the employees, whom Angela described as very close to Haley, Haley apparently portrayed the encounter as consensual. To the other two employees, both guidance counselors, Haley presented a hypothetical situation or a dream and asked for their advice. Though Haley seemed to have been describing her encounter with Tanner, it was not clear whether she characterized what happened as consensual or not.

At the end of the interview, Deputies Randall and Quandt said they would reach out to the Child Protection Center (CPC) the next morning to schedule an interview for Haley. They told Angela that Haley should bring her phone to the interview so they could take photos of the messages between Haley and Tanner's girlfriend. When Angela asked whether they wanted to seize Haley's phone, the deputies responded that there would be no need since Angela could give them consent to look through it.

The next day, Deputy Randall scheduled Haley's CPC interview for that Friday, September 30. Deputies Randall and Quandt did not investigate the case further in the two intervening days.

The morning of Haley's CPC interview, the deputies received a copy of the report prepared during Haley's hospital visit on Monday night. It contained Haley's account of the assault from that day:

> We were kissing. We were laying down. I don't remember how it started but he took his shirt off and I told him I don't want to do anything and he said why not. I said because of the risks. I asked him if he even had a condom and he said no. He said I didn't have to worry about anything because he'd been with his girlfriend for a year and a half and they'd done it a few times and she'd never gotten pregnant and they didn't use a condom. Then he took his pants off and his underwear and I kept telling him I didn't want to do anything and he said it was just one time and I didn't have to worry. He kept repeating that. He started kissing me again and laid me down and took my pants off. I kept telling him to stop and he never took my shirt off but he pulled my tank top up and he kissed me up and down like from my chest to where my underwear line would be. And then he did what he did. He laid on top of me and had sex with me and I just kept trying to push him off and I kept telling him no. He took his clothes to the bathroom and got dressed. Then he went to the living room with two other boys [names redacted]. After he had sex with me he forced me to put his penis in my mouth too.

The report also indicated that Haley had never had sex prior to the incident with Tanner.

Around 10 am, after the deputies had reviewed the report, Haley began her interview with the CPC social worker. Haley told the social worker that Tanner messaged her on Saturday from the Facebook account of another boy who was with him that night and asked her if he could come over. Haley said she was not supposed to have anyone at the house without her parents there, but Tanner kept messaging her. Eventually, Tanner showed up to the house with two other boys. All four went

downstairs to watch television. At some point, Haley asked Tanner if he was still with his girlfriend, and he said he had broken up with her.

Haley told the social worker that, after a while, Tanner got up and left the room. Haley found him in the laundry room, and he asked her about the other rooms on that floor of the house. She described them and identified her bedroom. Tanner walked into her room and lay down on the bed. Haley went to check on the other boys, then returned to her room and closed the door so it was just slightly ajar. Haley told Tanner that they should rejoin the other boys, but he said he wanted to stay in her room with her. The two talked about their classes, then Tanner got up and put his arms around Haley, as if they were slow dancing, and called her pretty.

As Haley recounted in the interview, Tanner pulled Haley over to the bed to sit with him. When Haley tried to get up, he grabbed her hand and pulled her back down. He lay on his back and asked her to lay down beside him. She did not want to, but Tanner "had [her] arm," and the other arm that was holding her body up "kind of slipped, so [she] went down. And [she] just stayed there." Haley described what happened next:

> He's like—he got up like on his side. And like–he like pulled my face closer to him and then he just started kissing me. And like I don't really know how it happened. It just ended up happening. And I kept telling him to stop. And he's like, "It's okay, it's okay." I'm like, "No, stop." He's like, "Well, I won't do anything." I'm like, "Don't." And he's like, "Well, what if I was somebody else?" I was like, "I still don't want to do anything." And he's like, "Why? Are you scared of getting pregnant?" I said, "Well, yeah." And he's like, "Trust me, I was with [my girlfriend] for a year and a half and we never used anything. And she's not—never been pregnant." I was like, "I don't care, I don't want to do anything." And I kept telling him no, and he wouldn't stop.

Walking more slowly through what happened, Haley told the social worker that when she and Tanner were sitting on the bed, Tanner pulled her shirt up and kissed her stomach and chest. As he did so, Haley tried to push his face away and pull her shirt down, and she told him to stop. He began unbuttoning her pants. She bent her knees to try to keep her pants on her legs, but he "force[d] her legs straight" and eventually succeeded in getting her pants and underwear off. Haley kept telling him to stop, but he did not. Haley told him that "even if [she] would want to do anything, he [didn't] have a condom, so [she] wouldn't be doing anything with him." He told her to go get one, and she told him she would not because she did not want to "do anything" in the first place. Tanner then put her leg on his shoulder, against her physical resistance, and "kept trying to put himself in [her]." She put her hand on his stomach and continued trying to push him away and repeated "so many times" that she did not "want to do anything," but he told her that it would be okay and that he would not hurt her. Tanner eventually succeeded in putting his penis in her vagina and also had his fingers in her vagina at a point. Once his penis was inside her, Tanner continued for some time until "finally" Haley removed his hands from her waist and sat up. Tanner told her to lay back down and "then he like had his hands behind [her] head, and he like put [her] face down and like he had his penis in [her] mouth." By the point Haley realized what "he was trying to do, like when [she] went to move [her] hands to push him away, he had already had [her] head like where [she] couldn't do anything." Haley pushed him away and told him that he needed to leave.

Tanner went to another room and put on his clothes. Haley and Tanner then walked back into the room with the television, where the other two boys were sleeping. The three boys left the house soon after.

After they were gone, Haley was "freaking out" and wondered if she should call someone. She explained to the social worker that she decided not to, worried that no one would believe her and that her parents would be angry. The next morning, Haley went to work and told her coworker Josie what happened. Josie encouraged

Haley to talk to her mother about it. At school on the following Monday, Haley spoke with two guidance counselors who "agreed . . . that if it happened to their kid, they would want them to tell them." That same day, Haley also talked about what happened with a third school employee. In the interview, Haley said that she did not "think [the employees] really knew what [she] was getting at, that it wasn't something that [she] wanted to do." She said she told the employees "what happened" but "didn't go into detail" and was left with the impression that they thought "it was something [she and Tanner] did because [they] wanted to."

Haley also said that in the days following the alleged assault she learned that Tanner had attended a bonfire earlier that night and had been asked to leave because he was drinking beer and smoking. She had not noticed anything unusual about his behavior at the time, but after hearing these reports she remembered that he was "kind of walking funny" at her house.

Before Haley left the CPC, Deputies Randall and Quandt took a photo of the message on her phone from Tanner's girlfriend. It read:

> I am hearing rumors that you and Tanner had sex on Saturday night. Out of respect for me would you please respond and tell me why people are saying this and what is going on. Thanks. . . . I see you don't respect girls that have boyfriends you're classy. (ellipsis in original)

At this point, Deputies Randall and Quandt agreed that they found Haley's account believable, particularly because her narrative during the interview was "virtually the same" as the statement she made at the hospital days earlier. They concluded that they had probable cause to arrest Tanner and made plans to pull him from school and interview him with his parents present.

Around 2 pm on the same day Haley visited the CPC, the deputies brought Tanner into the station for an interview. With his parents Timothy and Candi in the

room with him, Tanner answered questions about his activities on Saturday night. Initially, Tanner said he went to a bonfire and insisted that he had never been asked to leave. After he left the bonfire, he went to his girlfriend's apartment with three friends (two of whom were the boys Haley said joined him at her house). At some point, he said, he and his friends went to a gas station; eventually the other boys went home, and he slept over at his girlfriend's. Tanner repeatedly denied ever having gone to Haley's house or being asked to leave the bonfire. At one point during the interview, the deputies left the room and called the mother of the boy who hosted the bonfire. She told them she had asked Tanner to leave because she believed he was drinking and possibly doing drugs.

Deputies Randall and Quandt asked Tanner to make a written statement recounting his activities that night, and Tanner did so, composing a statement that made no mention of Haley. The deputies asked him to swear, under penalty of perjury, that his statement was true and correct to the best of his knowledge. At that point, Tanner changed his story and admitted that he had been at Haley's on Saturday night.

Tanner told the deputies that he "did go over to [Haley's] house, but she wanted it. She convinced [him]. She forced [him] pretty much." In Tanner's account, on Saturday night he went with his friends to the bonfire, where, he maintained, he was never asked to leave. He and two of his friends (the same two boys Haley had identified) eventually left on their own and went to Tanner's girlfriend's apartment. While they were there, Haley called one of the friends and told him to tell Tanner to come over to her place. Tanner and the two boys drove over together. When they arrived, they watched television with Haley until the other two boys fell asleep. Haley then asked Tanner to go into her room with her. Once there, Tanner told the deputies, Haley "turned on music, and she said, 'Want to have sex?' And she kept talking about it, trying to force [him]." She then "got on [him] and started kissing [him]. And she took her pants off and then she got on [him]" and

had sex with him. He told her to stop, but she would not. Eventually, she did stop, and Tanner went to the bathroom to put on his clothes. He could not remember whether they had used protection. Throughout this encounter, he said, the two other boys were asleep in the other room. After he was dressed, Tanner left with his friends. Tanner added that, prior to that night, he had had sex only once, a "long time ago."

Deputies Randall and Quandt told Tanner that they were going to charge him and take him into custody. Candi asked what would happen if the deputies discovered that the sex had been consensual. One of them answered:

> The best answer I can give you is it's our job to gather the facts, okay, and make a decision. We've made a decision, okay, based on the facts that we have at this point in time. And it's up to a judge or jury to decide if he's found guilty, okay, or if he is guilty of this. Okay? If something comes out later to disprove what we know at this point in time, it's possible things can change. I don't know.

Tanner asked why he was being arrested if he was "forced into" sex. Deputy Quandt replied that he did not believe Tanner's account of what happened but believed Haley, who said he assaulted her. Tanner responded, "Of course. Always believe the girl." When the deputies told him they had just watched Haley's CPC interview, Tanner requested the same interviewer, but the deputies denied his request. Candi asked whether the deputies intended to charge Tanner when they first brought him in. They said yes. Deputy Randall said that he "knew what [he] was going to do" but that he wanted to hear Tanner's side of the story first.

Candi told the deputies that they should investigate the rumors that Tanner and Haley had consensual sex. Candi said she heard the rumors from Tanner's girlfriend, who told her "that it was being said early on in the week that they had sex." Candi

provided the names of six people she thought Haley had been "bragging" to earlier in the week.  She also said that Haley "tried to do the same thing" to two other boys.

Deputies Randall and Quandt took Tanner into custody, and the state charged Tanner with three counts of sexual abuse in the third degree the following Monday. Over the following days, the deputies interviewed and received statements from a number of people both Tanner and Haley had mentioned, including the three school employees; one of the boys who was with Tanner at Haley's house; and two of Haley's friends, including the coworker she spoke to the day after the alleged assault. These people offered conflicting accounts of what they observed and of whether Haley described the encounter as consensual.  The deputies also obtained a statement from the woman whose son hosted the bonfire on Saturday night.  Tanner moved to suppress the statements he made during his interview with Deputies Randall and Quandt, arguing that they had been obtained in violation of his <u>Miranda</u> rights.  The court granted his motion, and the state dismissed the charges against him in July 2017.

The following year, Candi, Timothy, and Tanner brought suit against Deputies Randall and Quandt, the Tama County Sheriff, and Tama County.  The Walzes alleged that the defendants violated Tanner's federal constitutional rights by arresting him without probable cause and conducting a reckless criminal investigation.  They also brought state law claims against the defendants for false arrest, malicious prosecution, loss of consortium, and negligence.  In 2019, the defendants moved for summary judgment, and the district court granted their motion.  The Walzes now appeal.

-11-

## II.

We review grants of summary judgment de novo, <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc), viewing contested facts in the light most favorable to the opposing party and making all reasonable inferences in its favor, <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). A court at this stage "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue" but focuses on whether there are genuine disputes of material fact for trial. <u>Morris v. City of Chillicothe</u>, 512 F.3d 1013, 1018 (8th Cir. 2008).

Here, the defendants argue that summary judgment is appropriate both because no constitutional or state law violations occurred and, for the federal claims, on the basis of qualified immunity. "Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." <u>Santiago v. Blair</u>, 707 F.3d 984, 989 (8th Cir. 2013). If the answer to either question is no, the defendants are entitled to summary judgment. <u>See</u> <u>McCaster v. Clausen</u>, 684 F.3d 740, 746 (8th Cir. 2012).

A.[4]

The Walzes first argue that the district court erred in dismissing their claim that Deputies Randall and Quandt violated Tanner's Fourth Amendment rights by arresting him without probable cause.

Under the Fourth Amendment, warrantless arrests must be supported by probable cause. See Baribeau v. City of Minneapolis, 596 F.3d 465, 478 (8th Cir. 2010) (per curiam). Officers "are not required to . . . have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013). Rather, probable cause requires that the officers involved in an arrest are

---

[4]Before addressing the merits of the Walzes' claims, the defendants argue that, because the Walzes did not "resist or argue Defendants' summary judgment motion concerning the state claims of false arrest, malicious prosecution, or consortium loss," they have waived their right to appeal the grant of summary judgment on those claims. In the defendants' view, the Walzes' failure to preserve these claims for appellate review also means that "the federal issues plaintiffs appeal must be affirmed as well" under the law of the case doctrine. The defendants construe waiver too narrowly. The Walzes' state law arguments before this court are based on their position that Deputies Randall and Quandt arrested Tanner without probable cause; this same issue underlies their constitutional claims, and the Walzes spent considerable time before the district court arguing that the defendants violated Tanner's constitutional rights by arresting him without probable cause. Accordingly, in challenging the dismissal of their state law claims, they are not asserting "an argument raised for the first time on appeal," Eagle Tech. v. Expander Ams., Inc., 783 F.3d 1131, 1138 (8th Cir. 2015) (declining to consider on appeal arguments "materially different" from those presented to the district court, id. at 1139), but rather reasserting the same arguments they presented to the district court. The Walzes have not waived their right to appeal their state law claims, and we therefore do not reach the defendants' law of the case argument.

"aware of facts establishing a fair probability" that the person being arrested has committed a criminal offense. United States v. Figueroa-Serrano, 971 F.3d 806, 812 (8th Cir. 2020) (cleaned up); see also Gilmore v. City of Minneapolis, 837 F.3d 827, 832 (8th Cir. 2016) ("A law enforcement officer has probable cause when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." (cleaned up)). The existence of probable cause is based on the facts available to the officers "at the moment [an] arrest [i]s made," United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004), and is determined from "the standpoint of an objectively reasonable police officer," District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018).

When a person's alleged crime involves a victim, the victim's testimony can play a central role in supporting probable cause. In Clay v. Conlee, 815 F.2d 1164 (8th Cir. 1978), a sexual assault case, we held that "officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable." Id. at 1168. We have repeated this principle in a number of cases since. See, e.g., Matthews v. McNeil, 821 F. App'x 666, 667 (8th Cir. 2020) (per curiam); Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011) ("Officers may rely on the veracity of information supplied by the victim of a crime.") (cleaned up); Royster v. Nichols, 698 F.3d 681, 688 (8th Cir. 2012). In United States v. O'Dell, 766 F.3d 870 (8th Cir. 2014) (per curiam), we concluded that police officers had probable cause to search a defendant's room after they received statements from four alleged victims, one of whom was identified to the officers and three of whom were not, that the defendant had sexually assaulted them. Id. at 874. Similarly, in Kiser v. City of Huron, 219 F.3d 814 (8th Cir. 2000), we affirmed a grant of qualified immunity when an officer arrested someone "[b]ased solely" on "a credible and unsolicited report from the alleged victim," noting that although the report was "admittedly one-sided," it "contained sufficient detail to suggest that the complainant spoke truthfully." Id. at 816.

When Deputies Quandt and Randall arrested Tanner, they had probable cause to believe he had committed a crime. In Iowa, "a person commits sexual abuse in the third degree when the person performs a sex act . . . by force or against the will of the other person." Iowa Code § 709.4(1)(a); see also id. § 702.17 (defining "sex act"). "[T]he 'against the will of another' standard [of § 709.4(1)(a)] seeks to broadly protect persons from nonconsensual sex acts," State v. Kelso-Christy, 911 N.W.2d 663, 667 (Iowa 2018) (quoting State v. Meyers, 799 N.W.2d 132, 143 (Iowa 2011)), meaning that participants must give "meaningful consent" throughout a sexual encounter, id.; see also State v. Plaster, 424 N.W.2d 226, 233 (Iowa 1988) (explaining that sexual abuse occurs if the defendant continues to perform sex acts after the victim has withdrawn consent). In Haley's statement at the hospital and in her CPC interview four days later, she described a situation in which she repeatedly said "no" and attempted to push Tanner away, and in which Tanner proceeded to have sex with her nonetheless. Assuming Haley was speaking truthfully, Tanner's conduct likely constituted third-degree sexual abuse under Iowa law.

The deputies also had reason to give credence to Haley's account. Both of her reports were largely consistent with each other, and in the CPC interview in particular she provided a detailed description of the incident, going step by step through what happened between her and Tanner. Cf. Kiser, 219 F.3d at 816 (noting that detail can be an indication of credibility). Moreover, Deputies Randall and Quandt had experience with sexual assault cases and, drawing on that experience, found Haley credible and believed her description of the night. Cf. United States v. Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017) ("In determining whether probable cause exists, an officer may draw inferences based on his own experience." (cleaned up)). Because the deputies reasonably believed that Tanner had sexually assaulted Haley, they did not violate his Fourth Amendment rights by placing him under arrest.

The Walzes offer a number of arguments as to why the deputies were nevertheless unjustified in arresting Tanner. First, they claim that the deputies should

-15-

not have relied on Haley's account because she initially did not characterize the encounter as nonconsensual to her mother or to school employees and because her narrative was "vague." The Walzes are right that the adults Haley first spoke to were not initially left with the impression that Tanner had assaulted her. But by the time the deputies arrested Tanner, they had significantly more information from Haley, including information that added context to the adults' initial impressions. Notably, Haley said in the CPC interview that she thought she had not expressed herself to the school employees in the way she meant to and was left with the impression that they mistakenly believed she was describing a consensual experience. The deputies, relying on their experience with sexual assault cases, found Haley's explanation credible. And while the language Haley used in the interview may have been vague at times, she offered intimate, moment-by-moment details about what she and Tanner both were doing throughout the encounter. Though the Walzes are free to highlight Haley's purported "inconsistencies," we are not convinced any such inconsistencies are fatal to a finding of probable cause.

Moreover, Haley and her mother were not the only sources of information available to the deputies when they arrested Tanner. They also had Tanner's own interview, in which he repeatedly denied ever going to Haley's house on the night in question before changing his story entirely and admitting that he was there but claiming (using vague language) that she assaulted him.[5] A suspect's "apparently

_____

[5]The Walzes seem to argue that Tanner's interview should not be considered in the probable cause analysis because Deputies Randall and Quandt have testified that they personally believed they had probable cause to arrest Tanner before his interview. But the question in determining probable cause is not what the arresting officer subjectively believed, but rather whether, based on all "the events leading up to the arrest," a reasonable officer in the same position would have had probable cause to make an arrest. Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to

-16-

false statements and inconsistent stories" can support probable cause that he committed a crime. United States v. Ameling, 328 F.3d 443, 449 (8th Cir. 2003); Clayborn v. Struebing, 734 F.3d 807, 809 (8th Cir. 2013) (concluding that arguable probable cause existed when two witnesses accused a suspect of a crime and the suspect made inconsistent statements about that alleged crime). And here, Tanner's repeated dishonesty about what he did that night not only undermined his credibility when he denied assaulting Haley and accused her instead, but also made Haley's description more believable by comparison. Tanner's changing stories, combined with Haley's detailed accounts, further supported the deputies' probable cause determination.

The Walzes' next argument is that the deputies should have questioned Haley's veracity because of her age. As the Walzes point out, other circuits have "expressed serious concern about basing probable cause solely on the uncorroborated allegations of a child." Wesley v. Campbell, 779 F.3d 421, 430 (6th Cir. 2015). This caution may be appropriate in some situations, cf. Diana Younts, Note, Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions, 41 Duke L.J. 691, 697 (1991) ("Some of the studies examining children's suggestibility have found children to be prone to conforming their stories to the beliefs of the questioning adult."), but all of the cases the Walzes cite involve uncorroborated accusations by very young children—all under the age of eight. See Wesley, 779 F.3d at 424 (accusation by a seven-year-old); United States v. Shaw, 464 F.3d 615, 624 (6th Cir. 2006) (accusation by a three-year-old); Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985) (accusations by three- and five-year-olds); Marx v. Gumbinner, 905 F.2d 1503, 1507 (11th Cir. 1990) (accusation by a four-year-old); Rankin v. Evans, 133 F.3d 1425, 1428 (11th Cir. 1998) (accusation by a three-year-old); see

_____

probable cause." (cleaned up)); see also Thiel v. Korte, 954 F.3d 1125, 1128 (8th Cir. 2020) ("[Officers'] subjective intentions play no role in resolving the Fourth-Amendment issue. What controls is what an objectively reasonable officer could believe." (citation omitted)).

-17-

also Myers v. Morris, 810 F.2d 1437, 1456–57 (8th Cir. 1987) (rejecting "the inference that law enforcement personnel are necessarily less entitled to rely on details of criminal activity described by children than those described by adults" in a case involving eight-, nine-, ten-, and twelve-year-old alleged victims), overruled on other grounds, Burns v. Reed, 500 U.S. 478 (1991).  At the time of the alleged assault, Haley was 16 years old, just two years shy of the age of majority, and any concerns about the suggestibility or unreliability of child witnesses are less convincing as applied to her.  A reasonable officer may have considered her age as *a* factor in assessing her credibility, but it is not entitled to the weight the Walzes seek to ascribe to it.

Finally, the Walzes argue that Deputies Randall and Quandt violated the Fourth Amendment by arresting Tanner before properly investigating Haley's claims, citing Kuehl v. Burtis, 173 F.3d 646 (8th Cir. 1999), in support of their position.  Kuehl establishes that "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest."  Id. at 650 (cleaned up). In Kuehl itself, this court determined that a Fourth Amendment violation had occurred when the officers ignored a number of pieces of exculpatory evidence, interviewed the suspect for only twenty seconds before arresting her, and failed to interview an eyewitness at the scene of the alleged attack.  See id. at 648–49, 651. But in a number of cases since, we have explained that Kuehl is applicable primarily in cases in which there is a clear "lack of investigation" prior to arrest, not in any case in which officers might have sought more sources of information before arresting a suspect.  Clayborn, 734 F.3d at 809 (distinguishing Kuehl when officers made an arrest after obtaining physical evidence and interviewing witnesses, even though the witnesses' stories were inconsistent with the suspect's); see also, e.g., Gilmore v. City of Minneapolis, 837 F.3d 827, 833 (8th Cir. 2016) (finding Kuehl inapposite when the police arrested a suspect based on an eyewitness' detailed statement); Ross v. City

of Jackson, 897 F.3d 916, 922 (8th Cir. 2018) (applying Kuehl when officers arrested a suspect after seeing his Facebook post about guns, without any investigation into whether the post was a true threat and without giving the suspect any chance to explain himself).

In the Walzes' view, as expressed by their attorney at oral argument, granting summary judgment in favor of the defendants means that, going forward, if somebody tells the police she was raped, "that's enough—[they] don't need to do any further investigation" before arresting the person she accused. But that is not what happened here. In the four days between learning of the allegation and arresting Tanner, Deputies Randall and Quandt spoke to Haley's mother for over an hour; encouraged Haley to get a medical examination and reviewed the medical report, which included Haley's statement describing the alleged rape; collected physical evidence; observed Haley's CPC interview, which lasted more than an hour; compared Haley's interview with her statement in the medical report; and interviewed Tanner himself. Thus, unlike in Kuehl, the deputies made an effort to investigate what happened and to collect statements from the two witnesses to the alleged crime before effectuating an arrest. Though Haley's and Tanner's stories of what happened could not be reconciled, "[w]hen an officer is faced with conflicting information that cannot be immediately resolved, he may have arguable probable cause to arrest a suspect" even without additional investigation. Gilmore, 837 F.3d at 833 (cleaned up) (quoting Borgman, 646 F.3d at 523).

Additionally, even though some of the information the deputies later obtained from other people supports Tanner's version of events, this case is not one in which "minimal further investigation would have exonerated the suspect." Kuehl, 173 F.3d at 650 (cleaned up). Indeed, the post-arrest interviews are themselves contradictory, with some supporting Haley's account and some supporting Tanner's (and one, from one of the boys present at Haley's house, contradicting both). And as the district court put it: "[E]ven if the deputies had talked to additional witnesses prior to

-19-

arresting Tanner, at the end of the day, only two people were in the bedroom where the alleged rape occurred: Tanner and [Haley]." Walz v. Randall, No. 1:18-cv-00067, 2019 WL 7285555, at *11 (N.D. Iowa Dec. 27, 2019). Between the only two firsthand witnesses, the deputies credited Haley. We disagree that the deputies in this case failed to conduct "a reasonably thorough investigation" as required under Kuehl.

Deputies Randall and Quandt had probable cause to arrest Tanner and are, therefore, entitled to summary judgment on the Walzes' Fourth Amendment claim.

B.

The Walzes also allege that Deputies Randall and Quandt conducted a reckless criminal investigation prior to arresting Tanner, violating his substantive due process rights under the Fourteenth Amendment.

A police officer's failure to adequately investigate a criminal case may violate the suspect's constitutionally protected interest in "obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense." Wilson v. Lawrence Cnty., 260 F.3d 946, 956 n.8 (8th Cir. 2001). "To establish this violation, [a party] must show that [the police officer's] failure to investigate was intentional or reckless, thereby shocking the conscience. Negligent failure to investigate does not violate due process." Brockinton v. City of Sherwood, 503 F.3d 667, 672 (8th Cir. 2007) (citations omitted). Unlike a probable cause determination under the Fourth Amendment, "the recklessness standard has a subjective component." Amrine v. Brooks, 522 F.3d 823, 834 (8th Cir. 2008). Though the inquiry is context specific, Akins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009), "[w]e have held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence

-20-

suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence," id. at 1184.

The Walzes make many of the same allegations against Deputies Randall and Quandt in their Fourteenth Amendment claim as they do in their Fourth Amendment claim, arguing that the deputies should have interviewed more people and approached the "inconsistencies" in Haley's statements with more suspicion. But "[t]hese alleged faults are instances where the officers, at most, failed to investigate other leads and to explore inconsistencies in the evidence." Hawkins v. Gage Cnty., 759 F.3d 951, 957 (8th Cir. 2014) (cleaned up); see also Akins, 588 F.3d at 1184 ("[Plaintiff] highlights multiple errors and inconsistencies in [defendants'] investigation, but he has failed to show conscience-shocking reckless or intentional conduct."). We have held that such faults "do not evidence conscience-shocking recklessness"—perhaps especially in sexual assault cases. Hawkins, 759 F.3d at 957 ("False accusations of sexual assault create a difficult situation for police. Just as the officers were required to respect [the suspect's] rights, they also were expected to address [the alleged victim's] allegations and the purported threats against her and to respect her rights." (citation omitted)); see also Brockinton, 503 F.3d at 672 (granting qualified immunity when, in the face of inconsistent accounts, an officer credited an alleged victim's story and made an arrest on that basis).

Moreover, because our concern on this claim is with the investigation as a whole, rather than the basis for Tanner's arrest, we also consider the deputies' post-arrest efforts when evaluating whether they acted recklessly. In the days after they arrested Tanner, the deputies interviewed and obtained statements from multiple other witnesses. The deputies' continued effort to gather evidence about what happened between Tanner and Haley further supports the conclusion that they did not act recklessly in pursuing their investigation.

Though the Walzes feel that Tanner was treated unfairly, nothing in the deputies' statements or actions indicates that they acted recklessly as they investigated the allegations against him. "Conclusory allegations [of recklessness] will not suffice." Clemmons v. Armontrout, 477 F.3d 962, 966 (8th Cir. 2007). We therefore affirm the district court's grant of summary judgment on Walzes' the Fourteenth Amendment claim.[6]

C.

Finally, the Walzes allege that Deputies Randall and Quandt committed the state law torts of false arrest and malicious prosecution.

To succeed on their false arrest and malicious prosecution claims, the Walzes must demonstrate that the defendants made an arrest or pursued a prosecution unsupported by probable cause. See Children v. Burton, 331 N.W.2d 673, 678–79 (Iowa 1983) (listing elements of false arrest); Linn v. Montgomery, 903 N.W.2d 337, 345 (Iowa 2017) (listing elements of malicious prosecution). In their response to the defendants' motion for summary judgment, the Walzes acknowledged that "Iowa law on probable cause mirrors the law of probable cause under federal law." Because the deputies did have probable cause to arrest Tanner, see supra II.A., the Walzes cannot

---

[6]The Walzes bring their Fourth and Fourteenth Amendment claims against Tama County as well. "This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005). Because Deputies Randall and Quandt are not liable for any constitutional violation, the Walzes' action against Tama County was properly dismissed.

make out a key element of their state law claims. Deputies Randall and Quandt are therefore entitled to summary judgment.[7]

## III.

Viewing the facts in the light most favorable to the Walzes, they have not established a genuine dispute that the defendants' actions violated Tanner's constitutional or statutory rights. We affirm the judgment of the district court.

_____

[7]The deputies are also entitled to summary judgment on the Walzes' loss of consortium claim. See Oppedahl v. Navistar, Inc., No. 4:14-cv-00475, 2015 WL 12866992, at *8 (S.D. Iowa June 9, 2015) ("[L]oss of consortium claims will be dismissed if the injured party cannot recover from the defendant on the underlying claims.").